**DEFIANCE MILK PRODUCTS COMPANY, A DIVISION OF DIEHL, INC.,**
Plaintiff–Appellant,

v.

**Richard LYNG, Secretary of the United States Department of Agriculture,**
Defendant–Appellee.

No. 87–3045.

United States Court of Appeals,
Sixth Circuit.

Jan. 4, 1988.

Decided Sept. 27, 1988.

Marvin Beshore (argued), Milspaw & Beshore, Harrisburg, Pa., for plaintiff-appellant.

Verne K. Armstrong, Asst. U.S. Atty., Toledo, Ohio, Aaron B. Kahn, Office of the Gen. Counsel, U.S. Dept. of Agriculture, Raymond Fullerton (argued), Washington, D.C., for defendant-appellee.

Before MERRITT, KENNEDY and KRUPANSKY, Circuit Judges.

MERRITT, Circuit Judge.

The issue in this case is the validity of a temporary amendment to a Department of Agriculture order regulating the marketing of milk in the Ohio Valley Area, 7 C.F.R. part 1033 (1987), pursuant to subsection 8c of the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C. § 608c (1982). The District Court granted the Secretary's motion for summary judgment. We hold that the amendment, though questionable, was supported by substantial evi-

dence of a temporary glut of milk in the marketplace requiring action to alleviate the burden on certain milk handlers and is not in violation of the regulatory scheme created by Congress; therefore, we affirm the judgment of the District Court.

## I. *Regulatory Background: Milk Economics* [1]

This case requires us to "traverse the labyrinth of the federal milk marketing regulation provisions." *Zuber v. Allen,* 396 U.S. 168, 172, 90 S.Ct. 314, 317, 24 L.Ed.2d 345 (1969) (footnote omitted). In order to review the administrative action presently before us, a brief description of the history and mechanics of the federal milk regulatory program is needed.

> [T]he "milk problem" is exquisitely complicated. The city dweller or poet who regards the cow as a symbol of bucolic serenity is indeed naive. From the udders of that placid animal flows a bland liquid indispensable to human health but often provoking as much human strife and nastiness as strong alcoholic beverages.[2]

Two conditions peculiar to the milk industry led to the establishment of a federally regulated milk price structure. The first is that raw milk has essentially two end uses: as fluid milk and as an ingredient in manufactured dairy products such as butter or cheese. The second condition is seasonality. Dairy cows produce more milk in the spring "flush" season than they do during the fall and winter.

The confluence of these two conditions created problems which Congress decided necessitated regulation. Raw milk to be used as fluid milk commands a higher price than milk to be used in manufactured products. Fluid milk is highly perishable, and if it cannot be marketed quickly it must be manufactured into other dairy products. The milk used to produce manufactured products is referred to as "surplus." Fluid milk commands a higher price than surplus milk, in part because fluid milk from a particular geographic area is generally marketed in that area, while manufactured products from a particular geographic area must compete directly with other manufactured products from other areas, which often are marketed more cheaply due to factors such as economies of scale and production costs related to geography.

As a result of the natural two-price structure, dairy farmers, absent regulation, obviously would prefer to sell milk exclusively for fluid use. However, the seasonal nature of the dairy industry prevents this. A dairy herd sufficient to produce a supply of fluid milk adequate for consumer needs in the fall and winter will produce a glut in the spring.

Before regulation, milk distributors ("handlers") would obtain bargains during glut periods, engendering cutthroat competition among dairy farmers ("producers"). To maintain income, farmers would increase production even more. In the 1920's, producers restored equilibrium to the market by forming cooperatives. Cooperatives pooled their milk supplies and refused to deal with handlers except on a collective basis. This arrangement held until the drop in commodity prices during the Depression destroyed the market equilibrium. Congress responded by passing the Agricultural Adjustment Act of 1933, which gave the Department of Agriculture broad authority to regulate the marketing of commodities. After the Supreme Court's decision in *Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), which disapproved a similarly broad delegation of power under the National Industrial Recovery

---

**1.** *See generally United States v. Rock Royal Coop, Inc.,* 307 U.S. 533, 542–50, 59 S.Ct. 993, 998–1002, 83 L.Ed. 1446 (1939); *Zuber v. Allen,* 396 U.S. 168, 172–79, 90 S.Ct. 314, 316–20, 24 L.Ed.2d 345 (1969); *Block v. Community Nutrition Institute,* 467 U.S. 340, 341–43, 104 S.Ct. 2450, 2451–52, 81 L.Ed.2d 270 (1984); *Smyser v. Block,* 760 F.2d 514, 515–17 (3d Cir.1985). *See also* Kessel, *Economic Effects of Federal Regulation of Milk Markets,* 10 J.L. & Econ. 51 (1967); Brooks, *The Pricing of Milk Under Federal Marketing Orders,* 26 Geo.Wash.L.Rev. 181 (1958); Note, *Milk Orders: Selected Topics,* 31 S.D.L. Rev. 406 (1986).

**2.** *Queensboro Farm Products, Inc. v. Wickard,* 137 F.2d 969, 974 (2d Cir.1943) (Frank, J.).

Act, the agriculture act was amended by the Agricultural Adjustment Act of 1935, which authorized the substitution of a system of marketing orders for the system of agreements and licenses authorized by the 1933 Act.

The 1935 Act was amended by the Agricultural Marketing Agreement Act of 1937, codified as amended at 7 U.S.C. § 608c, which created the milk regulatory scheme that is in effect today. This act separated milk regulation from the regulation of other agricultural commodities. The Act seeks to raise the general level of producer prices by authorizing the Secretary of Agriculture, after notice and opportunity for hearing, to issue orders that regulate milk prices in given geographical market areas, thereby ensuring that the benefits and burdens of a particular market are shared by all producers serving the market.

Within a marketing area (an "order"), milk is classified according to its end use. Generally, there are either two or three classifications in an order. In Order 33, the marketing area in this case, there are three classifications. Fluid milk is Class I, while manufactured products are Class II and Class III.

All wholesalers of milk, so-called "handlers," pay a uniform minimum price for each use class, subject only to adjustment for "(1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers." 7 U.S.C. § 608c(5)(A).

On the other hand, dairymen or "producers" of milk who supply the handlers in a market receive a uniform "blend" price for their milk, regardless of its end use. The blend price is roughly the weighted average uniform price of all milk sold under the order during a given period. Competition among farmers to sell as much of their milk as possible for fluid use is thus eliminated. 7 U.S.C. § 608c(5)(C). *See, e.g.,* 7

C.F.R. 1033.72 (payments to producers in Order 33).

Individual handlers are unlikely to utilize milk in exactly the same proportion as the market as a whole. Therefore, handlers whose total class utilization value of the milk they use exceeds the uniform blend price value of the milk must make payments into a "producer-settlement" fund, while handlers whose class utilization value of their milk is less than the uniform blend price value of the milk receive payments out of the fund. The cumulative effect is supposed to be that producers in a market area receive a uniform price for the milk they sell, while handlers pay for the actual use value of the milk they purchase.

## II. *The Amendment to Order 33*

Appellant Defiance Milk Products Company ("Defiance"), a handler, is not a general wholesaler of milk but operates a milk processing plant at Defiance, Ohio, which manufactures evaporated whole milk and condensed milk, both of which are priced as Class III milk. At all times relevant to this case, Defiance was a regulated "pool supply" plant under Order 33, which means that it would give up milk to the fluid market when there was a shortage. As a pool supply plant, Defiance gave up for Class I use 50% or more of its milk supply during designated months, generally September through February. Defiance bought milk from independent producers and from producers who were members of cooperative associations, primarily Milk Marketing, Inc. (MMI).

In early 1983, MMI, which represented about 75% of the producers in Order 33, recommended an amendment of the order which would, on a temporary basis, reduce by 40 cents per hundredweight the price that handlers had to pay for producer milk used to manufacture some Class III products: namely, butter, nonfat dry milk powder, and cheese.[3] All three of these products were classified as Class III, but MMI's proposal would have created a new Class

---

**3.** The proposed amendment also applied to Order 36, the Eastern Ohio–Western Pennsylvania Marketing Area. We review the amendment only as it applies to Defiance.

III(A) limited to these three products. MMI stated that a recent surge in the volume of milk in the market, coupled with a decline in the demand for Class I milk, made the temporary amendment necessary. As a "balancer of supply," it would take the glut of milk on the market and would lose money if its selling price were not reduced so that it could peddle its excess milk to manufacturers of butter, dry milk powder, and cheese.

The Secretary held a rulemaking proceeding. Defiance urged that any amendment adopted should include a price reduction for all Class III products, rather than only for butter, dry milk, and cheese. Defiance pointed out that the products it manufactures, evaporated and condensed milk, are interchangeable for many uses with dry milk. (In its post-hearing brief at the administrative level, the company modified its position by requesting that only evaporated and condensed milk be added to the product uses to be considered for a price reduction rather than all Class III products. On appeal, Defiance argues only that evaporated milk should have been included. The reason for this change is that Defiance did not manufacture any condensed milk during the period the amendment was effective, and thus only paid a higher price for milk used to manufacture evaporated milk.)

The Secretary of Agriculture agreed that some price reduction was necessary as a result of the glut of milk in the market. Because of the emergency marketing conditions, an amendment was adopted without the issuance of a recommended decision and the opportunity to file exceptions. *See* Decision on Proposed Amendment to Marketing Agreements and to Orders, 48 Fed. Reg. 22,313 (1983) (amendment codified at 7 C.F.R. 1033.60(h), 7 C.F.R. 1036.60(f)). The amendment, which was effective in June and July 1983, granted pool handlers a $0.40 per hundredweight reduction in their pool obligation for milk used in processing butter, dry milk powder, and cheese. The Secretary stated that the price reduction did not apply to "some storable products such as canned milk and blends of margarine and butter, for which

there was no demonstration on the record that handlers incur losses in marketing milk for such uses." 48 Fed.Reg. at 22,- 316.

In September 1983, acting pursuant to 7 U.S.C. § 608c(15)(A), Defiance filed a petition with the Secretary stating that the amendment was not in accordance with law and praying for either a modification of or exemption from the amendment. The petition requested a refund, with interest, of the extra $0.40 per hundredweight Defiance had paid for producer milk during the period that the amendment was effective.

A hearing on the petition was held before an administrative law judge. On October 15, 1984, the ALJ granted Defiance's petition and ordered a refund of $68,011.44, but did not order the payment of interest.

Both parties appealed to the Departmental Judicial Officer. By a decision and order dated January 24, 1985, the Judicial Officer reversed the decision of the ALJ and dismissed the petition.

Acting pursuant to 7 U.S.C. § 608c(15)(B), Defiance filed a complaint in the District Court for the Northern District of Ohio. The complaint alleged that the amendment is not in accordance with law, is unsupported by substantial record evidence, is arbitrary, capricious, and an abuse of discretion, and is not authorized by the Act. After discovery, the case was submitted to the District Court on cross motions for summary judgment. The District Court granted the Secretary's motion and denied Defiance's motion. This appeal followed.

### III. *Discussion*

■ Our review of the Secretary's decision is limited to whether the decision is in accordance with law and whether the decision is supported by substantial evidence. *See Lehigh Valley Farmers v. Block,* 829 F.2d 409, 412 (3rd Cir.1987); *Suntex Dairy v. Block,* 666 F.2d 158, 162 (5th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 59, 74 L.Ed.2d 62 (1982). The Secretary's decision satisfies both of these standards.

■ Although the Secretary's opinion is not a model of clarity, the record is clear that emergency marketing conditions existed in Order 33. There is ample evidence in the record to support the Secretary's finding that the volume of milk in the market had surged and the demand for Class I milk had declined. Something had to be done to deal with the surge in surplus milk. The Secretary noted that all of the pool manufacturing plants that manufactured butter, dry milk, and cheese had been operating at close to 100% capacity; this was part of the reason MMI projected losses in handling surplus milk—the pool manufacturing plants could not take on any more milk and the milk had to be transported elsewhere, at MMI's expense. Defiance argues, however, that it had additional capacity to handle surplus milk that the Secretary did not take into account when he limited the amendment to "normal outlets."

The stated purpose of the amendment was "to provide more equitable sharing among all producers on the markets of the cost of disposing of surplus milk." 48 Fed. Reg. at 22,315. The Secretary chose to achieve this purpose by lowering the minimum price for the three products that he termed "normal outlets" for surplus milk. He stated that

> it would be appropriate to provide price relief under the orders to cover the actual losses incurred. Also, the price reduction should be on marketings of milk in only those uses that proponent stated are the normal outlets for seasonal surplus milk on these markets, namely butter, nonfat dry milk, and cheese (except cottage cheese and cottage cheese curd) plants.

48 Fed.Reg. at 22,316. Put another way, the Secretary's decision focused "on the measurable amounts by which the value of surplus milk going to certain uses would be depressed." Decision and Order of Department Judicial Officer at 56. Evaporated milk was not included because "there was no demonstration on the record that handlers incur losses in marketing milk for such uses." 48 Fed.Reg. at 22,316.

Despite Defiance's argument that it had excess "capacity" and would have bought milk at the reduced price, the record indicates only that Defiance would have "considered" buying more Order 33 milk if the price were lower. "Capacity" is not the test used by the Secretary in balancing supply and demand. The test seems to be whether a handler was committed to take milk on the market. The opportunistic and contingent nature of Defiance's interest in purchasing milk does not indicate that evaporated milk manufacturers would in fact purchase a significant amount of milk or that they were a primary outlet for a glut of surplus milk. The Secretary found that handlers of milk used to manufacture butter, powdered milk, and cheese would incur losses precisely because they were committed to buying surplus milk regardless of the price.

■ Absolute equality of treatment among handlers and producers is not required in milk marketing orders. The complexities of the market and the competing interests of market participants make it inevitable that someone will be unhappy with any regulation. As long as the regulation is based on substantial evidence, we will not disturb the Secretary's decision.

After all, the Secretary must look at the area with a wide and comprehensive perspective. He has before him the entire output of milk in the area, and he must search for the best ways and means for its disposition. Aware of the annual consumption and distribution of fluid milk, he must arrange to channel the residue into outlets the most advantageous to the producer and consumer. He fashions his order accordingly. Of course, there may be some resultant damage to a handler or producer in the enforcement of the Act but this lack of perfection does not destroy the validity of the Order.... If the Secretary cannot "produce complete equality, for the variables are too numerous", he fulfills his role when he makes a reasoned Order.

*United States v. Mills*, 315 F.2d 828, 838 (4th Cir.), *cert. denied*, 375 U.S. 819, 84

S.Ct. 57, 11 L.Ed.2d 54 (1963) (citations omitted). In this case, the Secretary attempted to provide relief for emergency conditions by adopting the amendment. Even if our hindsight led us to a different conclusion about the proper scope of the amendment, we would not disturb the Secretary's conclusions because they are based on substantial evidence in the record.

■ Defiance also argues that the amendment violates the price uniformity requirement of § 608c(5)(A). The amendment that was originally proposed by MMI would have created a new Class III(A), and prices within that class would have been uniform. The amendment adopted by the Secretary, however, did not explicitly create a new class. Instead, the amendment merely modified the procedure by which the minimum price for some, but not all, of the products within Class III was computed. Thus, Defiance argues, the prices within Class III were not uniform as to each other and the amendment was unlawful.

The Secretary argues that the effect of the amendment was the creation of a new class and that to argue that price uniformity has been violated is "dead wrong" and a "meritless and lackluster elevation of form over substance." Gov't Brief at 36. Although we agree with the Secretary that uniformity was not violated in this particular case, we think that Defiance's argument is neither "meritless" nor "lackluster." The Secretary's argument seeks to augment his powers beyond those contemplated by the Act and misperceives the limited extent of his administrative powers under the Act. It insists on judicial deference to administrative discretion where deference is not due. The argument apparently is that because the Secretary could have created a new Class III(A), he could amend the regulations in any way that had the same effect on pricing. However, "[t]he statute before us does not contain a mandate phrased in broad and permissive terms." *Zuber v. Allen*, 396 U.S. at 183, 90 S.Ct. at 323. In fact, the "very purpose" of the Act

was to avoid the infirmity of overbroad delegation and to set forth with particularity the details for a comprehensive regulatory scheme.... It is clear that Congress was not conferring untrammeled discretion on the Secretary and authorizing him to proceed in a vacuum. This was the very evil condemned by the courts that the 1935 amendments sought to eradicate.

*Id.* at 185, 90 S.Ct. at 324 (footnote omitted).

Despite the narrow discretion afforded the Secretary, we hold that the amendment was permissible under the emergency circumstances of this case. The transcript of the rulemaking proceeding and the published decision that accompanied the amendment indicate that all of the parties involved contemplated the creation of a new class more accurately reflecting the fluctuations in supply in the marketplace. The Department Judicial Officer inferred that the amendment was written as a temporary reduction in the handlers' net pool obligations for Class III simply because that course required the amendment of only one rather than several sections of the regulations; he inferred that the Secretary wanted to avoid engaging in extensive and costly reprogramming of the Department's computers in order to implement a price change that would only be effective for two months. This inference may be correct, although there is nothing in the record to guide us on the question. What is clear from the record, though, is that all of the parties at the hearing contemplated the creation of a new, temporary class, and the Secretary's action had that effect. If the amendment had been permanent rather than of a mere two months' duration, the explicit creation of a new class would have been appropriate. Under the circumstances of this case, however, we will not hold that price uniformity was violated simply because the Secretary chose the most convenient or the least disruptive method to effect a temporary change.

The efficacy of government regulation of milk markets has been criticized. *See* Ippolito & Masson, *The Social Cost of Government Regulation of Milk*, 21 J.L. & Econ. 33, 60–61 (1978) (estimating annual

cost of regulation at $60 million; expressing doubt as to continuing validity of alleged benefits of regulation). As an Article III court, however, we sit in judgment of a regulation's lawfulness, not its economic efficiency. No question is raised concerning the validity of the regulatory scheme administered by the Secretary. *See United States v. Rock Royal Co-op, Inc.*, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939). We do note, however, that the Secretary's action in this case was an attempt to make the regulatory structure responsive to the vicissitudes of the marketplace. We are dealing with agency actions taken in response to unusual market conditions. If a system of market regulation is going to exist, we should not discourage the Secretary's reasonable attempt to make market demand catch up with supply through lower prices, although Defiance may be correct that it would have been wiser to lower prices more generally.

We hold that the amendment to Order 33 was supported by substantial evidence and was in accordance with law. Therefore, the judgment of the District Court is AFFIRMED.