FARMERS UNION MILK MARKETING COOPERATIVE, Gerald Piche, Peter J. Kleiman & Edward O. Kleiman, Art J. Corey, Jr., Raymond J. Marsicek, Ralph Brock, Ed E. Hanchek, Robert S. Hanchek d/b/a Hanchek Bros., Raymond S. Huber, Benjamin C. Huber, George A. Huber, on behalf of themselves and all members of Farmers Union Milk Marketing Cooperative pooled under Federal Order 40, Plaintiffs–Appellants,

v.

Clayton YEUTTER, Secretary of Agriculture, United States Department of Agriculture, Defendant–Appellee,

Producers Equalization Committee, Defendant–Intervenor–Appellee.

No. 89–2298.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 17, 1990.

Decided April 11, 1991.

Mark W. Reinke (argued), Grief, Bus & Blacklidge, Chicago, Ill., for plaintiffs-appellants.

Edward R. Cohen (argued), Dept. of Justice, Appellate Staff, Civ. Div., Washington, D.C., Edith A. Landman, Office of U.S. Atty., Grand Rapids, Mich., for defendant-appellee.

David VanderHaagen (argued), Foster, Swift, Collins & Coey, Lansing, Mich., for intervenor-appellee.

Marvin Beshore, Harrisburg, Pa., for amicus curiae Nat. Farmers Organization, Inc.

Before KRUPANSKY and BOGGS, Circuit Judges, and CONTIE, Senior Circuit Judge.

BOGGS, Circuit Judge.

This case concerns a fight between two different groups of dairy farmers over who will get certain benefits of federal milk price regulations. The Producers Equalization Committee ("PEC") persuaded the Department of Agriculture to enact regulations that help its members at the expense of the plaintiff, Farmers Union, and its members. Having lost before the Department of Agriculture, Farmers Union sued to overturn the Secretary's decision. The district court held that Farmers Union did not have the right to sue over this particular type of regulation (promulgated pursuant to the Agricultural Marketing Agreement Act ("AMAA"), 7 U.S.C. § 601, *et seq.*) and dismissed the case.

The milk industry has long been subject to extensive government regulation. These regulations cover every aspect of the industry and are not limited to regulations designed to assure that only pure wholesome milk is sold. Since the 1930s, Congress has eschewed reliance on market forces to price milk and has substituted a complex regulatory scheme to control the prices paid to producers.

In this case, the Department of Agriculture has modified the price regulations in a way that adversely affects the plaintiffs. The PEC and the Department of Agriculture maintain that the plaintiffs can't sue because review is precluded by law. The district court agreed and dismissed the case. Because we believe that the purpose of the statutory scheme—raising the price that milk producers receive for their milk—would be undermined if producers could not challenge regulations of this type in federal court, we now reverse.

## I

Government regulation of the milk industry is, according to the conventional wisdom, based on a number of facts that are unique to that particular industry. The degree to which these facts mirror economic reality is not before us; the belief, on the part of Congress and federal regulators, that the milk industry is subject to certain deficiencies that are incurable by market forces has led to a particular regulatory structure. This regulatory structure makes sense only when viewed against the backdrop of the perceived exigencies that have given rise to it. This court has previously had occasions to discuss the structure of milk industry regulation. *Defiance Milk Products Co. v. Lyng*, 857 F.2d 1065 (6th Cir.1988). There, we explained the underlying basis and structure of the price regulatory scheme set out in the AMAA:

> Two conditions peculiar to the milk industry led to the establishment of a federally regulated price structure. The first is that raw milk has essentially two end uses: as fluid milk and as an ingredient in manufactured dairy products such as butter or cheese. The second condition is seasonality. Dairy cows produce more milk in the spring "flush" season than they do in the fall and winter.

> The confluence of these two conditions created problems which Congress decided necessitated regulation. Raw milk to be used as fluid milk commands a higher price than milk to be used in manufactured products. Fluid milk is highly perishable, and if it cannot be marketed

quickly it must be manufactured into other dairy products.

*Id.* at 1066.

Dairy farmers would obviously prefer selling milk at a higher price than at a lower price. Accordingly, they would like to sell all of their milk for use as fluid milk. Unfortunately, "[a] dairy herd sufficient to produce a supply of fluid milk adequate for consumer needs in the fall and winter will produce a glut in the spring." *Ibid.* Absent some sort of regulatory regime, it is likely that some sort of market equilibrium would develop. The parties tell us that, prior to regulation, milk producers would compete with each other to assure themselves of selling all their milk during the flush periods. "Before regulation, milk distributors ('handlers') would obtain bargains during glut periods, engendering cut-throat competition among diary farmers ('producers'). To maintain income, farmers would increase production even more." *Ibid.* We assume that, as with most products, the increased production led to a drop in prices. The AMAA sets up a complex scheme in order to prevent this competition among milk producers.

The key portion of this regulatory scheme allows individual producers of milk to *receive a uniform* price for their milk regardless of the ultimate end use while handlers *pay different* rates depending on the ultimate end use to which the milk is put. The device by which this is accomplished is the producer settlement fund.

The AMAA allows the Secretary of Agriculture to promulgate "market orders" regulating the minimum price of milk to be paid to producers. 7 U.S.C. § 608c(5). The Secretary can do so only after formal, on-the-record rulemaking. 7 U.S.C. § 608c(3) & (4). The location where the handler sells the majority of its milk to the ultimate consumers determines which market order governs the particular handler. This case concerns Market Order No. 40, which governs the price of milk sold in the Southern Michigan area. Though all of the handlers governed by the order sell a majority of their milk in the Southern Michigan area, some handlers located in the upper penin-

sula and in Wisconsin are governed by Market Order No. 40. This appeal involves producers located in the upper peninsula of Michigan and Wisconsin who sell their product to handlers regulated by Order 40.

Order 40 divides all milk sold to handlers into three categories. Class I milk is the most expensive and includes fluid milk commonly used for drinking. Class II milk is milk used to produce intermediate-level milk products such as yogurt and cottage cheese. And class III milk is used for the production of manufactured milk products such as cheese and butter. 7 C.F.R. § 1040.40. The regulations set out a complicated pricing mechanism by which the price for milk sold for ultimate use in each different category is calculated. *See* 7 C.F.R. §§ 1040.50, 1040.51, 1040.51(a).

Although the regulatory scheme sets out different prices for each category of milk, the purpose of the statute is, as we have said, to eliminate competition among producers to place milk with handlers who are believed to be willing to pay more because they are using the milk for fluid milk purposes. Accordingly, producers receive from purchasing handlers a uniform minimum "blend price" that is determined by a complicated formula that approximates the weighted average class price of all milk sold in the Order 40 area. 7 C.F.R. § 1040.60. As individual handlers generally do not sell milk for use in each class in the same proportion as the market as a whole, some handlers end up paying too much and some end up paying too little to the dairy farmers. This is where the producer settlement fund comes into play. Those handlers whose class price obligations exceed the blend price must pay into the producer settlement fund, while those with class price obligations below that of the blend price receive payments

from the producer settlement fund.[1] Thus, for example, a handler whose milk is sold for fluid consumption will pay into the producer settlement fund while a handler who makes cheese will receive payments from the producer settlement fund. But both are obligated to pay the same minimum uniform price to the producer.

There are more complications. The system outlined above sets the blend price, which is subject to various adjustments, including so-called location adjustments, at issue in this case.[2] The theory behind location adjustments is that milk further away from the market where it is to be sold (in this case, Southern Michigan) is less valuable. Location adjustments therefore adjust the blend price *down* as one gets further away from the market where the milk is consumed. Under Order 40, the portion of the lower peninsula outside of the Detroit–Saginaw–Flint market area is divided into zones. The further the zones are away from the main market, the larger the location adjustment (and hence the lower the minimum price). Outside of the lower peninsula of Michigan, there is a mileage rate added on top of the adjustment for the zone located furthest from the Detroit–Saginaw–Flint area.

Obviously, a producer's attitude toward location adjustments depends on location. The type and amount of location adjustments will have significant distributive consequences. A large location adjustment will have an effect both on the minimum price that must be paid by handlers located further away and on the distribution of money from the producer settlement fund.

One more detail of the regulatory scheme is necessary to complete the picture. Although the AMAA mandates a minimum price, it does not mandate a maximum price. Handlers cannot pay less than

1. Although this is the mechanism for distributing the money in the Producer Settlement fund used by the Southern Michigan Market Order, a few orders employ a somewhat different mechanism. In the Ohio Valley Market and Texas Market Orders, for example, all class price obligations are paid by handlers into the producer settlement fund, and uniform prices are then paid from the fund to the producers by the Federal Market Administrator. *See, e.g.,* 7 C.F.R. §§ 1033.71–.72 (Ohio Valley); 7 C.F.R. §§ 1126.71–.73 (Texas).

2. There are also adjustments for butterfat content. 7 C.F.R. § 1040.74. The rulemaking at issue in this case changed the butterfat adjustment as well, but, fortunately, those adjustments are not at issue in this case and we will discuss them no more.

the blend price, but they are allowed to pay as much as they want. In times of relative scarcity, handlers can and do negotiate premiums, known as "over-order" prices, for the sale of the milk. These premiums are most typically paid for milk that is intended for Class I use, but they can apply to any of the three classes. Thus, market forces are allowed to intrude on this regime on occasion, though only in one direction.

The existence of over-order pricing serves to complicate further the already complex relationship between producers and handlers. Generally, one would expect that it would be in the interest of milk producers to have a high blend price while handlers would prefer a low blend price. There are, however, some situations in which the handler would actually prefer a *higher* blend price. Where the handler believes that the market will mandate an over-order price for the milk, that handler would prefer a higher blend price if the handler were, for example, a cheese manufacturer who receives payments from the producer settlement fund.

## II

Prior to September 1989, the Order 40 location adjustments divided the lower peninsula into seven different zones with price adjustments of 0 cents, –5 cents, –7 cents, –9 cents, –11 cents, –14 cents, and –17 cents. In May 1988, the PEC, which represents farmers located in the lower peninsula, presented two proposals to the Department of Agriculture. The Department of Agriculture convened a formal rulemaking hearing at which it considered the PEC proposal. At this hearing, the PEC took a position that furthered its members' financial interests. As one would expect, Farmers Union did the same.

The PEC wanted the number of zones in the lower peninsula reduced from seven to three. They also argued that the price adjustments within the three zones should be 0 cents, –5 cents, and –7 cents. This would have the effect of raising the minimum prices within the lower peninsula of Michigan. Further, the PEC proposed changes to the prices outside of the lower

peninsula. They suggested that there should be a larger downward adjustment for each mile outside of the lower peninsula, arguing that the current adjustment did not reflect increased transportation costs. Because it correctly believed that this proposal would hurt its members, Farmers Union, which represents producers located in the upper peninsula and Wisconsin, has steadfastly opposed the PEC proposals.

The rulemaking at issue in this case proceeded in an apparently normal fashion. The AMAA allows regulated handlers to file a petition for modification of a market order, 7 U.S.C. § 608c(15)(A), and the PEC presented its proposal in the appropriate manner. The Department of Agriculture issued a notice that it was contemplating changes in Order 40 and would hold a hearing. 53 Fed.Reg. 15851 (May 4, 1988). The PEC presented its proposal at the public, formal, on-the-record rulemaking proceeding that was held pursuant to this announcement on May 24, 1988. In February 1989, after considering the administrative record, the Department of Agriculture issued its recommendation for changes in Order 40. 54 Fed.Reg. 7938 (February 24, 1989). Farmers Union vigorously opposed the PEC proposal at every opportunity before the Department, but to no avail. This proposal was approved by the Department of Agriculture and, as required by the AMAA, submitted to producers for their approval. The suggested changes were approved by a vote of the affected producers. 54 Fed.Reg. at 26779. The final decision was issued in June 1989. 54 Fed.Reg. 26768 (June 26, 1989).

Under the new regulations, the number of zones within the lower peninsula was reduced and the downward adjustments within the lower peninsula were reduced as well. 7 C.F.R. § 1040.52(a)(1) was amended as the PEC suggested—the number of zones was reduced to three and the location adjustments within the three zones were –0 cents, –5 cents, and –7 cents. 54 Fed.Reg. at 26780. Moreover, as the PEC suggested, the new regulations also amended the location adjustment for those plants located

outside of the lower peninsula of Michigan from one cent per hundredweight per ten miles to 2.25 cents per hundredweight per ten miles. 54 Fed.Reg. at 26780. Although Farmers Union agreed that the one cent per cwt. per ten mile figure was too low, they did not think that it should have been adjusted as much as the Department of Agriculture decided that it should be adjusted. 54 Fed.Reg. at 26777. Instead, Farmers Union maintained that the figure should be 1.53 cents per cwt. per ten miles. As Farmers Union is quick to point out, these changes, as adopted, *raise* the minimum price in the lower peninsula of Michigan while *reducing* the minimum price everywhere else.

Farmers Union represents farmers who sell to handlers located in Wisconsin and the upper peninsula of Michigan. There is no serious question that they are worse off under the new regulations than they were under the older system. The Department of Agriculture concluded that "producers in the western and northern part of the state will receive more for their milk, while producers delivering their milk to plants located outside the marketing area will receive less for their milk." 54 Fed.Reg. at 26779. However, the Department of Agriculture also concluded that "[n]ot enough detailed information is available to be able to determine how much more or less will be paid to producers for delivering milk to plants in the specific zones." 54 Fed.Reg. at 26779. Nonetheless, according to the plaintiffs, this would also result in a redistribution of monies in the producer settlement fund away from producers located in the upper peninsula and in Wisconsin to those producers located in the lower peninsula. The plaintiffs argue that the changes in the location adjustments in the lower peninsula would, in and of itself, reduce the amount of pool proceeds available to producers in the upper peninsula and Wisconsin by over $600,000. Of necessity, this increases the pool proceeds available to milk producers within the lower peninsula of Michigan by a corresponding amount.

Having lost the battle before the administrative agency, adversely affected parties filed suit challenging the new regulations. The appellants here—Farmers Union and several affiliated producers—filed suit on September 15, 1989. In its suit, Farmers Union alleged, *inter alia*, that the amendments to Order 40 were made for reasons not authorized by the AMAA, that the Order was not supported by substantial record evidence as required by the APA, and that the Secretary exceeded his authority by amending Order 40 without finding that disorderly market conditions existed.

Three handlers from outside of the lower peninsula, Lansing Dairy Inc., the Liberty Dairy Co., and the Frigo Cheese Corporation also filed suit challenging the amendments to Order 40. As the suit was based on the same rulemaking, the handler plaintiffs made many of the same factual allegations and legal claims as did Farmers Union. On the motion of Farmers Union, the court below consolidated the two cases because of the similarity of factual and legal claims. Subsequently, the court dismissed the handlers' lawsuit because they had failed to exhaust their administrative remedies. That decision was not appealed, so the appropriateness of that order is not before us.

The court below also dismissed the Farmers Union case. Relying on *Block v. Community Nutrition Institute*, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), the district court concluded that the structure of the AMAA impliedly precluded review by courts in lawsuits initiated by anyone other than handlers. According to the court below, no lawsuit can ever be initiated to challenge an action taken under the AMAA by anyone other than a handler unless no handler has standing to challenge the action before the agency. Because this action is being challenged before the agency by the handlers, the court ruled that Farmers Union does not have standing to challenge the actions. Thus, the appeal before us does not concern the merits of the action. Rather, it deals only with whether the court below had jurisdiction to review the actions in this particular case.

The complexity of the relationships among the participants in the milk market-

ing process is well illustrated by the number of different positions taken in this case. The PEC had previously been granted permission to intervene as a co-defendant, and it has filed a brief as an intervenor-defendant-appellee. Though the PEC agrees with the Department of Agriculture that Farmers Union should lose, the PEC has rested its argument on much narrower grounds. Interestingly, the National Farmers Organization, a member of the PEC, filed an amicus brief in support of Farmers Union. Though the NFO adamantly opposes Farmers Union's position on the merits, the NFO does believe that Farmers Union should be allowed to proceed with its suit. Evidently, the NFO has taken the quite sensible position that it would be unwise to preclude future lawsuits by its own members in future disputes involving the AMAA.

### III

The question before us is whether the provisions of the AMAA explicitly or implicitly preclude judicial review of amendments to market orders in suits by producers.[3] This case is governed by the provisions of the Administrative Procedure Act. "The APA confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute,' 5 U.S.C. § 702, but withdraws that cause of action to the extent the relevant statute 'preclude[s] judicial review,' 5 U.S.C. § 701(a)(1)." *CNI*, 467 U.S. at 345, 104 S.Ct. at 2453. "Whether agency action is

reviewable often poses difficult questions of Congressional intent; and the Court must decide if Congress has in express or implied terms precluded judicial review...." *Barlow v. Collins*, 397 U.S. 159, 165, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970). In so doing, we first "determine whether Congress precluded all judicial review, and, if not, whether Congress nevertheless foreclosed review to the class to which the plaintiff belongs." *Association of Data Processors Service Organization, Inc. v. Camp*, 397 U.S. 150, 173, 90 S.Ct. 827, 841, 25 L.Ed.2d 184 (1970) (Brennan, J., concurring).

We have no difficulty in resolving the first issue—whether Congress precluded all judicial review of milk market orders under the AMAA. As the Supreme Court has explained, "[i]t is clear that Congress did not intend to strip the judiciary of all authority to review the Secretary's milk market orders." *CNI*, 467 U.S. at 346, 104 S.Ct. at 2454. Accordingly, we turn quickly to the far more difficult issue of whether the AMAA precludes review to the class (producers) to which the plaintiff belongs.

Rhetorically, the dispute between the parties in this case is a dispute about characterization. In two cases, the Supreme Court has dealt with the problem of whether a particular class of plaintiffs can seek review of milk market orders promulgated under the AMAA. Farmers Union touts *Stark v. Wickard*, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944), a case in which the Supreme Court allowed producers to challenge a regulation involving *distribution of money* in the producer settlement fund.

---

**3.** The parties to this case have exhibited a certain degree of terminological imprecision, probably due in part to the complexity of this area of the law. The court below ruled, based on *CNI*, that the provisions of the AMAA impliedly precluded review in lawsuits brought by the class of parties to which the plaintiffs belong. The parties, while citing all the right cases and making all the right arguments, have characterized this as an issue of "standing." There is no question that Farmers Union has standing as that term is normally used. The members of Farmers Union have suffered injury in fact—financial loss. *See Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). They are, further, within the "zone of

interests" arguably protected by the statutory scheme. *Id.* at 157, 90 S.Ct. at 831.

It is true that the issue of whether review is precluded by law is somewhat related to the issue of standing, and the two issues are often implicated in the same case. Where, as here, we conclude that review is not precluded with respect to all classes of parties and examine the issue of whether a particular class gets to challenge agency action in its lawsuit, the issue begins to take on many of the characteristics of "standing." We are, after all, deciding if a particular party has the right to challenge a particular action. But, as a technical matter, our case does not involve an issue of standing, but rather one of statutory preclusion of review.

Farmers Union calls *Stark* the "seminal case" on the issue before us. The Department of Agriculture and PEC (following the lead of the court below) instead characterize *Stark* as a "narrow exception" to the rule as clarified in 1984 by the Supreme Court in *CNI*, where the Court held that review of a market order in a suit by *consumers* was impliedly precluded by the AMAA.

## IV

In *Stark*, the plaintiff milk producers challenged regulations that required a deduction from the producer settlement fund to make payments to cooperatives. *Stark*, 321 U.S. at 301, 64 S.Ct. at 567. The plaintiff producers alleged that these payments were not authorized by the statute. *Id.* at 302, 64 S.Ct. at 567. The Court noted that there was "of course, no question that the challenged deduction reduce[d] pro tanto the amount actually received by producers for their milk." *Ibid.* The Court had no trouble inferring that producers should be allowed to challenge this action, stating that "[t]he statute and Order create a right in the producer to avail himself of a minimum price afforded by Governmental action. Such a right created by statute is mandatory in character and obviously capable of judicial enforcement." *Id.* at 303, 64 S.Ct. at 567–68.

The action in this case has a similar effect on Farmers Union. As in *Stark*, the changes in Order 40 affect the minimum price that can be received by producers of the milk. Further, the changes to Order 40 also affect the distribution of money from the producer settlement fund, in which the plaintiffs, as milk producers, have a proprietary interest. *Id.* at 308, 64 S.Ct. at 570. By reducing the payments from the producer settlement fund the regulatory changes directly reduce the amount that the plaintiffs are entitled to receive for their milk. The fact that the members of Farmers Union may negotiate over-order prices and end up getting the same price does not undermine their argument. As

the *Stark* Court explained, "[t]he fact that the producer may sell to the handler for any price above the minimum is not of moment in determining whether or not the statute and Order secure to him a minimum price." *Id.* at 303, 64 S.Ct. at 567. Changes in location adjustments siphon funds out of a pool in which Farmers Union has a proprietary interest. To be sure, our case involves siphoning funds from one group of farmers to another, while *Stark* involved a claim that funds had been diverted to a party not entitled to get any money at all from the producer settlement fund. We do not believe that this distinction is important. In our case, as in *Stark*, the plaintiff producers have alleged that regulations divert money to a party not entitled to it by law. We fail to see why it matters that the parties receiving the allegedly illegal payments in this case could conceivably be entitled to other payments that are legal.

Thus, if *Stark* were the only word from the Supreme Court on the matter, we would have little trouble holding that Farmers Union should be allowed to sue. We turn now to *CNI*, to determine if that case alters this conclusion.

## V

The Department of Agriculture and PEC both stress the importance of *CNI*, rather than *Stark*. In *CNI* the plaintiffs were ultimate consumers of milk products who wanted to challenge a market order that they claim increased the prices that they had to pay. In particular, consumers challenged a regulation that required handlers who sold reconstituted milk for drinking rather than for other uses to pay the Class I rate for milk rather than the Class II rate.[4] *CNI*, 467 U.S. at 343, 104 S.Ct. at 2453. The Court held that the provisions of the AMAA impliedly precluded review in suits instituted by consumers.

On its facts, our case is closer to *Stark* than it is to *CNI*. Our case involves a suit by producers—a class protected by the

---

**4.** The market order at issue in *CNI* divided milk into two classes rather than three, as is the case in Order 40. *CNI*, 467 U.S. at 342–43, 104 S.Ct. at 2452.

statutory scheme—rather than by consumers. If, as a rule, an affected consumer could challenge regulations that made him or her pay a higher price for a particular product, the number of potential lawsuits would be enormous. Purchasers of automobiles, oranges, convertible debentures, or even electricity can all make colorable claims that they pay more because of various government regulations. Allowing lawsuits by all of the people harmed in some way by regulations—in the sense that they would be wealthier absent the regulation—would be unthinkable. The holding of *CNI*—if the holding is defined narrowly—does not require us to rule that review of this regulatory change by milk producers is precluded by law.

Thus, the appellees rely primarily on the analytical approach employed by the Supreme Court in *CNI*. The district court advanced a radical reading of the Supreme Court's opinion in *CNI*. In *CNI*, the Supreme Court observed that

> Congress channeled disputes concerning marketing orders to the Secretary in the first instance because it believed that only he has the expertise necessary to illuminate and resolve questions about them. Had Congress intended to allow consumers to attack provisions of marketing orders, it surely would have required them to pursue the administrative remedies provided in § 608c(15)(A) as well. The restriction of the administrative remedies to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders.

*Id.* at 347, 104 S.Ct. at 2455.

Producers are not allowed to pursue administrative remedies. Relying on the reasoning of *CNI*, the district court concluded that this omission demonstrates that the statutory scheme precludes review in suits brought by producers. The radical reading of *CNI* is supported by a Ninth Circuit case, *Pescosolido v. Block*, 765 F.2d 827 (9th Cir.1985). In *Pescosolido*, the plaintiff orange producers wished to get a declaration of their rights under Order 907, a citrus marketing order. *Id.* at 830. The

Ninth Circuit held that the statutory scheme precluded review, stating that *CNI* "can be interpreted generally to preclude judicial review sought by anyone other than handlers...." *Id.* at 831. We call this a radical reading of *CNI* because, if this reasoning were widely applied, it would restrict judicial review to those parties provided with administrative remedies in an overwhelming number of cases.

The radical interpretation of *CNI*—that *CNI* establishes a general rule of unreviewability where there is some type of scheme for administrative review—takes a portion of the Court's reasoning in *CNI* out of context. The Supreme Court did not purport to establish a rule that judicial review in cases initiated by those who cannot pursue administrative remedies is *always* precluded whenever a statutory scheme gives some party the right to an administrative hearing. The Supreme Court did not provide a litmus test by which we could ascertain whether judicial review is precluded by law. Instead, the Court outlined several factors that go into making this determination. The Court stated that we should look to the statute's "express language, ... the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative actions involved." *CNI*, 467 U.S. at 345, 104 S.Ct. at 2454. We think that it is fair to read the discussion in *CNI* about the presence of administrative remedies to be a portion of its discussion of the structure of the legislative scheme. That discussion is clearly relevant to our case. It gives one reason—a good reason—to find that review is precluded by law. But it is not dispositive. We also think that it is incumbent upon us to consider *all* of the factors that the Supreme Court told us to consider, not just one. The availability of administrative remedies is a clue to the structure of the legislative scheme. We have a responsibility to consider other clues as well.

The purpose of the AMAA strongly favors judicial review of aspects of market orders that concern producers in lawsuits brought by producers. As we have explained, the purpose of the AMAA is to insulate milk producers from the effects of

competition caused by the seasonal nature of milk production and the variable prices caused by different uses. We have recognized that the primary purpose of the scheme is to "raise the general level of producer prices by authorizing the Secretary of Agriculture ... to issue orders that regulate milk prices in given geographical market areas, thereby ensuring that the benefits and burdens of a particular market are shared by all producers serving the market." *Defiance Milk*, 857 F.2d at 1067. More importantly, the Supreme Court recognized this goal in *CNI:* "[t]he 'essential purpose [of this marketing order scheme] is to raise producer prices....'" *CNI*, 467 U.S. at 342, 104 S.Ct. at 2452, *quoting* S.Rep. No. 1011, 74th Cong., 1st Sess. 3 (1935) (bracketed material in original).

We believe that the legislative purpose of increasing producers' prices would be furthered by allowing them to challenge actions that they believe reduce those prices illegitimately. "The right of judicial review is ordinarily inferred where congressional intent to protect the interests of the class of which the plaintiff is a member can be found; in such cases, unless members of the protected class may have judicial review the statutory objectives may not be realized." *Barlow*, 397 U.S. at 167, 90 S.Ct. at 838. The location adjustments at issue in this case decrease the minimum prices to be paid to the Farmers Union members and divert funds from the producer settlement fund. We believe the purpose of the scheme would be undermined if producers were wholly unable to challenge these changes.

Nor does the structure of the legislative scheme convince us that review has been precluded. The structure of the legislative scheme is more ambiguous with respect to whether producers can challenge market orders than it is with respect to whether consumers can challenge market orders. Like consumers, producers cannot participate in administrative remedies. All things being equal, this could give rise to an inference that producers are precluded from challenging market orders. However, the considerations that would cause direct review by consumers to be particu-larly pernicious do not apply to review in suits instituted by producers. The number of producers who can be adversely affected by a particular decision is far smaller than the number of consumers who could make such a claim. Thus, we believe that the danger of disrupting the administrative scheme by allowing consumers to sue directly in federal district court is far less serious than the danger that would be posed by consumer suits. *Cf. CNI*, 467 U.S. at 348, 104 S.Ct. at 2455. The Ninth Circuit suggested in *Pescosolido* that it would be anomalous to "leave handlers in the disadvantaged position of being limited to their statutory remedy while producers are free to raise direct challenges in the district court." *Pescosolido*, 765 F.2d at 832. We disagree. We have already noted that the purpose of the AMAA is wealth redistribution in favor of milk producers. Placing milk producers in a favored position is surely consistent with this legislative purpose. Thus, we believe that allowing review in suits of this type would enhance, rather than undermine the statutory purpose. *Cf. United States v. Fausto*, 484 U.S. 439, 449–52, 108 S.Ct. 668, 674–75, 98 L.Ed.2d 830 (1988).

Accordingly, we conclude that an analysis of the regulatory scheme does not evince an intent to preclude judicial review in suits of this type. This case is distinguishable from *CNI* because no inference of legislative intent to preclude review can be drawn from the absence of administrative remedies for producers, in light of the strong legislative purpose. Adoption of the radical interpretation of *CNI* would effectively undermine the presumption in favor of judicial review that the Supreme Court has consistently reaffirmed. *See, e.g. Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670, 106 S.Ct. 2133, 2135–36, 90 L.Ed.2d 623 (1986); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681 (1967).

VI

The district court formulated the issue in somewhat different terms than we have.

It started from the view that *CNI* imposes a general rule of nonreviewability where the statute gives some party the right to an administrative hearing but that *Stark* creates a narrow exception to the rule. It had to make the admission that *Stark* still has some validity because in *CNI* the Supreme Court expressly reaffirmed the validity of *Stark*. *CNI*, 467 U.S. at 351, 104 S.Ct. at 2457. The court proceeded on a false assumption. As we have discussed above, we do not believe that *CNI* establishes a general rule of unreviewability where an administrative remedy is provided to someone.

In any event, the court then relied on *Pescosolido* to find that the "*Stark* exception" did not apply. In *Pescosolido,* the Ninth Circuit stated that "[t]he *Stark* exception is limited to situations in which producers claim that some 'definite personal right' granted by the statute is being infringed by the Secretary of Agriculture acting outside the scope of his delegated authority, with no handler having standing to protest." *Pescosolido,* 765 F.2d at 832. The court concluded that because a group of handlers are now pursuing administrative remedies, the Farmers Union should not be allowed to proceed with a similar claim. The PEC relies almost entirely on the existence of this claim, arguing that it somehow renders the claim by Farmers Union superfluous. The parties have argued at great length about the nature and probable success of the handlers' litigation, and provided frequent updates about the progress of that claim.

We believe that the importance of this issue has been exaggerated, both by the parties and by the court below. In *CNI,* the Supreme Court explained that handlers were, in *Stark,* unable to challenge the deductions from the producer settlement fund and that "there was 'no forum' in which this aspect of the Secretary's actions could *or would* be challenged. Judicial review of the producers' complaint was therefore necessary to ensure achievement of the Act's most fundamental objectives— to wit, the protection of the producers of milk and milk products." *CNI,* 467 U.S. at 352, 104 S.Ct. at 2457 (emphasis added).

The Court did not just talk in terms of whether handlers were in fact challenging a particular action. Instead, it discussed whether the actions *would* be challenged. It would be incongrous to make the issue of whether review is precluded by law—an issue of statutory construction—turn on the fortuitous question of whether some handler actually challenges a proposed regulation. In *CNI,* the Court made it clear that it considered this issue at a more abstract level, in terms of the *interests* of the parties involved: "Handlers, like consumers, are interested in obtaining reliable supplies of milk at the cheapest possible prices." *Ibid.* The interplay of interests of handlers and producers is, by all accounts, quite complex. But, as a general rule, handlers want lower prices while producers want the opposite. As producers are the ones protected by the statute, we believe that they should be allowed to challenge actions that reduce their minimum prices.

### VII

For the above reasons, the case is REVERSED and REMANDED.