**LANSING DAIRY, INC.; Liberty Dairy Company; Frigo Cheese Corporation (92–2231); Farmers Union Milk Marketing Cooperative; Gerald Piche; Peter J. Kleiman; Edward O. Kleiman; Art J. Corey, Jr.; Raymond J. Marsicek; Ralph Brock; Ed E. Hanchek; Robert S. Han-**

---

chek; Raymond S. Huber; Benjamin C. Huber; George A. Huber, on behalf of themselves and all members of Farmers Union Milk Marketing Cooperative pooled under Federal Order 40 (92–2232), Plaintiffs–Appellants, Cross–Appellees,

Manitowoc Milk Producers Association (92–2232), Intervenor Plaintiff–Appellant, Cross–Appellee,

v.

Mike ESPY, successor to Edward R. Madigan, Secretary of Agriculture (92–2448/2449), Defendant–Appellee, Cross–Appellant,

Producers Equalization Committee (92–2233), Intervenor Defendant–Appellee, Cross–Appellant.

Nos. 92–2231, 92–2232, 92–2233, 92–2448, 92–2449.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 28, 1994.

Decided Oct. 31, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 23, 1995.

**1342**

John H. Vetne (argued and briefed), Blodgett, Makechnie & Vetne, Newburyport, MA, Howard D. Cline, Cline, Cline & Griffin, Grand Blanc, MI, for Lansing Dairy, Inc., Liberty Dairy Co. and Frigo Cheese Corp.

Edward R. Cohen (argued and briefed), Barbara C. Biddle, U.S. Dept. of Justice, Appellate Staff, Civil Div., Washington, DC, John A. Smietanka, U.S. Atty., Edith A. Landman, Office of the U.S. Atty., Grand Rapids, MI, Gregory Cooper, U.S. Dept. of Agriculture, Washington, DC, for Edward R. Madigan.

David VanderHaagen (argued), Stephen J. Rhodes (briefed), Foster, Swift, Collins & Coey, Lansing, MI, for Producers Equalization Committee.

Mark W. Reinke (briefed), Guth & Coughlin, Chicago, IL, Benjamin F. Yale (argued and briefed), Waynesfield, OH, for Farmers Union Milk Marketing Co-op., Gerald Piche, Peter J. Kleiman, Edward O. Kleiman, Art J. Corey, Jr., Raymond J. Marsicek, Ralph Brock, Ed E. Hanchek, Robert S. Hanchek, Raymond S. Huber, Benjamin C. Huber, George A. Huber and Manitowoc Milk Producers Ass'n.

Before: CELEBREZZE, MARTIN, and BATCHELDER, Circuit Judges.

BATCHELDER, Circuit Judge.

This case concerns a dispute between groups of milk handlers, milk producers, and the Secretary of Agriculture (the "Secretary") over how certain benefits of federal milk price regulations should be distributed. This is a consolidated appeal from a decision of the United States District Court for the Western District of Michigan arising under the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C. §§ 601–74 (AMAA or the "Act").

The AMAA authorizes the Secretary to issue, and to amend, marketing orders for a wide variety of agricultural products, including milk. Milk marketing orders set the minimum prices which those who process dairy products, designated as handlers (as defined in 7 C.F.R. § 1040.9 (1994)), must pay to dairy farmers, designated as producers (as defined in 7 C.F.R. § 1040.12 (1994)). Specifically at issue in this appeal are the 1989 amendments to 7 C.F.R. Part 1040 §§ 1040.1–.86 (1994) ("Order 40"). The contested amendments changed plant location adjustments, 7 C.F.R. § 1040.52(a)(1) (1994), and increased mileage rates, 7 C.F.R. § 1040.52(a)(2) (1994), in Order 40; the net effect of these changes was to decrease revenues for some producers and handlers outside of the Southern Michigan milk marketing area. Groups of producers and handlers, upon whom the 1989 amendments have a negative financial impact, challenged the validity of these amendments on a number of grounds.

The district court, on cross-motions for summary judgment in these consolidated actions, held that the location adjustments promulgated by the Secretary pursuant to 7 U.S.C. § 608c(5) were invalid for failure to consider the economic factors outlined in 7 U.S.C. § 608c(18). Therefore, the district court ordered the Secretary to promulgate new location adjustments, specifically considering the economic factors in 7 U.S.C.

§ 608c(18). The determinative issue before the court in this appeal is whether the Secretary's power to order location adjustments is founded solely on the grant of authority in 7 U.S.C. § 608c(5), as urged by the Secretary; or whether, as argued by the plaintiffs and held by the district court, this power is conditioned on consideration of the economic criteria found in 7 U.S.C. § 608c(18). Because we find that the language of the relevant statutory provisions is ambiguous and that the Secretary's interpretation of those provisions is reasonable, we now reverse.

## I.

In order to understand this case, it is necessary to examine the mechanism used for the establishment of milk prices. This Court has addressed the circumstances surrounding the enactment of the AMAA in two prior cases. See *Farmers Union Milk Mktg. Coop. v. Yeutter,* 930 F.2d 466 (6th Cir.1991); *Defiance Milk Prods. Co. v. Lyng,* 857 F.2d 1065 (6th Cir.1988). In *Defiance Milk Products,* this Court explained the underlying basis and structure of the price regulatory system set out in the AMAA:

> Two conditions peculiar to the milk industry led to the establishment of a federally regulated milk price structure. The first is that raw milk has essentially two end uses: as fluid milk and as an ingredient in manufactured dairy products such as butter or cheese. The second condition is seasonality. Dairy cows produce more milk in the spring "flush" season than they do during the fall and winter.
>
> The confluence of these two conditions created problems which Congress decided necessitated regulation. Raw milk to be used as fluid milk commands a higher price than milk to be used in manufactured products. Fluid milk is highly perishable, and if it cannot be marketed quickly it must be manufactured into other dairy products.

*Defiance Milk Prods.,* 857 F.2d at 1066.

Absent regulation, dairy farmers would obviously prefer to sell milk exclusively for fluid use since it commands the highest price; however, the seasonal nature of the dairy industry prevents this. A dairy herd sufficient to produce a supply of fluid milk adequate for consumer needs in the fall and winter will produce a glut in the spring. Before regulation, handlers would obtain bargains during glut periods engendering aggressive and arguably destructive competition among producers. To maintain income, producers would increase production even more. In the 1920's, equilibrium was restored to the market by the formation of producer "cooperatives" which pooled their milk supplies and refused to deal with handlers except on a collective basis. However, the drop in commodity prices during the Depression destroyed the market equilibrium attained during the 1920's era of relative stability.

In 1933, in an effort to restore order to the various agricultural markets and boost the purchasing power of farmers, Congress decided to take the matter out of the hands of the free market. To that end, Congress enacted the licensing provisions of the Agricultural Adjustment Act, which resulted in the adoption of "base-rating plans not unlike the private arrangements that obtained in the 1920's...." *Zuber v. Allen,* 396 U.S. 168, 175, 90 S.Ct. 314, 318, 24 L.Ed.2d 345 (1969). However, in response to judicial decisions disapproving congressional economic initiatives which enacted "broad delegation of power.... Congress moved swiftly to eliminate the defect of overbroad delegation and to shore up the void in the agricultural marketing provisions." *Id.* Accordingly, in 1935, Congress, by amendment to the Agricultural Adjustment Act, adopted the AMAA, which is essentially the current agricultural marketing agreement structure.

Under the AMAA, the Secretary is given the authority, and the responsibility, to formulate and administer federal milk marketing regulations in various regions throughout the United States. See 7 U.S.C. § 608c(5). Each of these regions is referred to as a "marketing area" and the regulations concerning the marketing of milk in the area are commonly referred to as "orders." There are presently forty-four such milk marketing orders being administered by the Secretary throughout the United States. These are described at 7 C.F.R. Parts 1001–1139 (1994), and these marketing areas encompass virtu-

ally all major metropolitan areas in the United States.

Although the system established by the AMAA to regulate the sale of milk is of labyrinthine complexity, the first step is relatively simple: Handlers purchase milk from producers. However, the means by which this transaction is handled are quite complex due to the unique market for milk products. Milk which is alike in all other respects varies in price according to the use to which the milk is put. *See* 7 C.F.R. § 1040.40 (1994). Some milk is distributed in fluid form. This milk, called Class I, commands the highest price. 7 C.F.R. § 1040.50(a) (1994). Class II milk is milk that is made into "soft products" such as yogurt and cottage cheese. It is priced lower than Class I milk. 7 C.F.R. § 1040.50(b) (1994). Other products with a longer shelf life (such as butter, cheese, and powdered milk) are considered to be Class III; the milk used to produce these products commands the lowest price. 7 C.F.R. § 1040.50(c) (1994). The Class I price only is further adjusted based on the location of the plant within the marketing area. *See* 7 C.F.R. § 1040.52(a) (1994).

Through a device known as the producer settlement fund, the current system ensures that while producers receive a uniform price, handlers pay different rates depending on the ultimate end to which the milk is put. Handlers pay (directly to the producers) a minimum price that is set by regulation and computed by a complex formula that is basically an "average" price for milk that is used for all three classes. 7 C.F.R. § 1040.61 (1994). Because the price is an average price, some handlers end up paying too much and some end up paying too little. The difference between what they have paid and what the milk they have purchased is worth is made up through the producer settlement fund. 7 C.F.R. § 1040.70 (1994). Handlers who have bought milk to be used for Class I purposes (and who have thus paid too little) pay money in to the fund, 7 C.F.R. § 1040.71 (1994), while those who have bought milk for

Class III purposes receive payments from the fund. 7 C.F.R. § 1040.72 (1994). Because all producers receive the same uniform blend price, competition among farmers to sell as much of their milk as possible for fluid use is eliminated. Therefore, the theory goes, the producer delivering primarily into the Class I plant will, over time, receive more money than he would have had he priced his milk in competition with milk otherwise going into the Class III plant. The Class I producer thus receives value from other producers' deliveries to the Class III plant and, in recognition of that under the Order, he pools his Class I receipts with those of Class II and III, and all producers receive the uniform blended price. 7 U.S.C. § 608c(5)(C); 7 C.F.R. § 1040.73 (1994).

The minimum blend price paid to the producers is uniform in the sense that it does not vary based on the use to which the milk is put, but there are other factors that affect the amount of money that handlers pay and producers receive for milk. At issue in this case are the changes to minimum price wrought by "location adjustments." Location adjustments are adjustments to the base minimum price of milk, which are used as economic incentives to encourage the movement of producer milk from rural production areas to plants in population centers, and to align prices among neighboring markets. *See Walmsley v. Block,* 719 F.2d 1414, 1418–19 (8th Cir.1983). This encouragement in Order 40 is provided by a negative adjustment that "lowers" minimum prices for producer milk that is delivered to plants in rural locations, and a positive adjustment that "increases" minimum prices for milk that is delivered from rural production areas to plants in urban areas.[1] Location adjustments honor the fact that a handler who receives milk near areas of high consumption has a more valuable commodity than a handler who receives milk in a rural area where it is produced cheaply, but who must undertake the burden of transporting the milk to

---

1. For example, as explained *infra,* prior to the amendments to Order 40 at issue in this case, plaintiff Lansing Dairy was located in an area with a –5 cent location adjustment. As a result, Lansing Dairy paid five cents per hundredweight less than the minimum price to producers for the milk that it purchased. The amendments to Order 40 placed Lansing Dairy in a 0 cents adjustment zone; therefore, Lansing Dairy must now pay 5 cents more per hundredweight for its milk than it did prior to the amendments to Order 40.

consumer markets. *See Schepps Dairy, Inc. v. Bergland,* 628 F.2d 11, 15–16 (D.C.Cir. 1979). Although handlers pay adjustments only on Class I milk, the producers receive adjustments on all of their milk because producers cannot be paid based on their use of milk. *See* 7 C.F.R. § 1040.75 (1994).

The free market also affects prices to a small extent. Although the minimum price is set by regulation, there is no maximum price. In the winter, when milk is relatively scarce, handlers can negotiate premiums called "over-order" price for the sale of milk. Market forces can, therefore, raise the price of milk but cannot lower it. There are other factors which affect the ultimate milk prices, but they are not involved in this case.

## II.

Before issuing, or amending, a milk marketing order, the Secretary must conduct a formal on-the-record rulemaking proceeding. The public must be notified of these proceedings and provided an opportunity for public hearing and comment. 7 U.S.C. § 608c(3). In addition, before a milk marketing order, or amendment, may become effective, it must be approved by the handlers of not less than 50% of the volume of milk covered by the proposed order or amendment and also must be approved by at least two-thirds of the affected dairy producers in the region. 7 U.S.C. § 608c(8).

### A. The Rulemaking Proceedings

Prior to September 1989, the Order 40 location adjustments divided the Michigan lower peninsula into seven different zones with price adjustments calculated according to the distance of the zone from the major market (Detroit–Flint–Bay City). The price adjustments in these zones (calculated in cents per hundredweight) were 0 cents, –5 cents, –7 cents, –9 cents, –11 cents, –14 cents, and –17 cents. In 1988, intervenor defendant-appellee, Producers Equalization Committee (PEC), presented two proposals for amendments to Order 40 to the Secretary. *See* 53 Fed.Reg. 15,851 (1988).

The PEC proposed an amendment to the location adjustments that did away with the old zoning scheme and substituted three zones with adjustments of 0 cents, –5 cents, and –7 cents. *See* 7 C.F.R. § 1040.52(a)(1) (1994). The effect of this amendment was to increase the number of counties that were in the zone that had a 0 cent adjustment. In addition, by eliminating the zones with the greatest negative adjustments, the amendment had the general effect of increasing the amount which producers received for milk produced throughout the Southern Michigan milk marketing area, the area in which the member producers of the PEC are located.

Further, the PEC proposed changes to prices outside of the lower peninsula of Michigan. The mileage rate sets the price adjustment for producers located outside of the Southern Michigan region. This adjustment is made by increasing the mileage rate, which has the concomitant effect of lowering the minimum price received by producers outside of the marketing area.[2] The regulation is based on the shortest highway distance between the plant located outside the region and a plant within the region determined by the Secretary. 7 C.F.R. § 1040.52(a)(2) (1994). The applicable adjustment rate is based on cents per hundredweight per ten miles. Under the old regulations, the fixed amount was 1 cent; under the PEC's proposed regulation, adopted by the Secretary, the fixed amount is 2.25 cents.

The rulemaking proceeded in an apparently normal fashion, and no challenge is made to the technical aspects of those proceedings. The final decision was issued in June 1989. *See* 54 Fed.Reg. 26,768 (1989). The net effect of the rulemaking proceeding was the almost *in toto* adoption of the PEC's proposed amendments to Order 40.

### B. The Handlers' Action

On August 22, 1989, three of the handlers affected by the amendments to the location adjustments in Order 40 initiated an action in the United States District Court for the Western District of Michigan, invoking the

---

**2.** For example, the producer plaintiffs in this action claim that the amendment to the mileage rate adjustment reduced the price paid to producers by an additional 13 to 23 cents per hundredweight.

jurisdiction of the district court pursuant to 7 U.S.C. § 608c(15)(B) and 28 U.S.C. § 1331, and seeking judicial review of the final decision of the Secretary of Agriculture rendered pursuant to 7 U.S.C. § 608c(15)(A). Thereafter, on September 15, 1989, a similar action was initiated in the same court by a group of producers from the area affected by the amendments.

These actions were consolidated; however, the district court dismissed each action. The handlers' action was dismissed on the ground that, under *Block v. Community Nutrition Institute,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), and *United States v. Ruzicka,* 329 U.S. 287, 67 S.Ct. 207, 91 L.Ed. 290 (1946), a handler must "exhaust his available administrative remedies before seeking judicial review of a marketing order." Dismissal of the handlers' action was not appealed; rather, the handlers initiated a proceeding for administrative review, pursuant to 7 U.S.C. § 608c(15)(A). Thereafter, on July 12, 1990, an Administrative Law Judge (ALJ) issued an Initial Decision and Order declaring the Secretary's "action in amending 7 C.F.R. § 1040.52(a)(1) and (2) ... was not in accordance with law."

Pursuant to 7 C.F.R. §§ 900.65–71 (1994), the Secretary appealed the adverse determination of the ALJ to the Judicial Officer. On December 12, 1991, the Judicial Officer issued his Decision and Order, reversing the ALJ's decision, and rejecting all challenges to the promulgation of the location adjustment amendments and mileage rate amendments. *See In re Lansing Dairy Inc.,* 50 Agric.Dec. 1453, 1991 WL 313838 (Dec. 12, 1991). The Judicial Officer held that the amendments had been properly promulgated by the Secretary in accordance with § 608c(5), that there was no need to consider § 608c(18) economic factors, and that the amendments were therefore valid.

On December 23, 1991, handlers initiated their part of the present action, pursuant to 7 U.S.C. § 608c(15)(B). Plaintiff handlers present action seeks judicial review of the Secretary's final administrative order, issued by the Judicial Officer, which upheld the challenged location adjustment amendments. Handlers also challenge the underlying rulemaking held pursuant to 7 U.S.C. §§ 608c(3) and (4).

## C. The Producers' Action

Plaintiffs below who are producers of milk invoked the jurisdiction of the district court pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–06, and 28 U.S.C. §§ 1331 and 1337, seeking review of that section of the Secretary's order, *see* 54 Fed. Reg. 26,780 (1989), which amended certain sections of Order 40. The producers initiated their action on September 15, 1989, directly challenging the rulemaking proceeding which resulted in the location adjustment and mileage rate amendments to Order 40. On October 2, 1989, the district court dismissed the producers' action on the ground that the producers "lack standing to challenge the validity of Order 40." In *Farmers Union Milk Marketing Cooperative v. Yeutter,* 930 F.2d 466 (6th Cir.1991), however, this Court reversed the district court's dismissal of the producers' action, and held that the district court had jurisdiction to hear the producers' direct challenge to the Secretary's promulgation of the location adjustment amendments. Accordingly, the producers' action was remanded to the district court, and, on January 29, 1992, the producers' and handlers' actions were consolidated by the district court.

## D. The District Court's Decision

On March 30, 1992, the district court, in *Farmers Union Milk Marketing Cooperative v. Madigan,* Nos. 1:89–CV–281, 5:91–CV–104, 1992 WL 71372 (W.D.Mich. Mar. 30, 1992), issued an Opinion and Order granting the consolidated plaintiffs' motion for summary judgment, holding that the contested price amendments were unlawful because the Secretary failed to consider statutorily mandated supply and demand factors set forth in 7 U.S.C. § 608c(18). The district court declined to decide other claims of rule invalidity raised by plaintiffs; the district court deferred issues of damages and remedy pending additional briefing.

In the remedies phase of the proceeding, the PEC argued that if the 1989 price amendments were invalid for failure to apply § 608c(18) criteria, preexisting rates were equally invalid for the same reason. On August 25, 1992, the district court issued an

Opinion and Order on the issue of remedies, holding that the preexisting location adjustments were equally invalid for failure to consider § 608c(18) criteria. For this reason, the district court denied plaintiffs' request for injunctive relief because such relief would result in "reinstatement of a prior invalid rule or would leave the market unregulated." *Lansing Dairy, Inc. v. Madigan,* No. 5:91–CV–104, 1992 WL 71372 (D.Mich. Aug. 25, 1992).

For predominately the same reason, the district court held that the plaintiffs' measure of damages is not the difference between 1989 rates and preexisting rates because such a measure would erroneously "presume that the old regulations were somehow more valid than the present regulations...." *Id.* Accordingly, the district court: (1) allowed the invalidated 1989 rates to remain in effect pending expedited rulemaking to adopt lawful rates for the future; and, (2) remanded the issue of damages, for expedited adjudication by the Secretary, to be based on the difference between prices paid under the invalidated regulations and prices which would have been paid had proper regulations been issued in 1989.

### III.

### A.

This action comes before this Court on cross-motions for summary judgment. Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The fact that both parties have filed summary judgment motions does not alter the standard by which we review these motions. "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broadcasting Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991) (quoting *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir. 1987)).

The moving party has the burden of conclusively showing that no genuine issue of material fact exists. *Id.* at 247. Nevertheless, in the face of a summary judgment

motion, the nonmoving party cannot rest on its pleadings but must come forward with some probative evidence to support its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *60 Ivy St. Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987).

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The dispute must be genuine and the facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the nonmoving party. *60 Ivy St. Corp.,* 822 F.2d at 1435. If the disputed evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted).

### B.

The key issue dividing the plaintiffs and the defendants is the interpretation and interplay of two provisions of the AMAA: § 608c(5) and § 608c(18). This is apparently the first time this precise issue has come before any federal court.

7 U.S.C. § 608c(5)(A) provides that milk orders shall contain one or more of the following terms and conditions:

(A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or

any use classification thereof, is made to such handlers.

7 U.S.C. § 608c(18) states:

The Secretary of Agriculture, prior to prescribing any term in any marketing agreement or order, or amendment thereto, relating to milk or its products, if such term is to fix minimum prices to be paid to producers or associations of producers, or prior to modifying the price fixed in any such term, shall ascertain the parity prices of such commodities. The prices which it is declared to be the policy of Congress to establish in section 602 of this title shall, for the purposes of such agreement, order, or amendment, be adjusted to reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk or its products in the marketing area to which the contemplated marketing agreement, order, or amendment relates. Whenever the Secretary finds, upon the basis of the evidence adduced at the hearing required by section 608b of this title or this section, as the case may be, that the parity prices of such commodities are not reasonable in view of the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk and its products in the marketing area to which the contemplated agreement, order, or amendment relates, he shall fix such prices as he finds will reflect such factors, insure a sufficient quantity of pure and wholesome milk to meet current needs and further to assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs, and be in the public interest. Thereafter, as the Secretary finds necessary on account of changed circumstances, he shall, after due notice and opportunity for hearing, make adjustments in such prices.

The plaintiff handlers and producers assert that any adjustment made to price via a § 608c(5) location adjustment is an adjustment to the § 608c(18) minimum price and must therefore take into account the economic factors found in § 608c(18). The Secretary, however, while agreeing that his authority to *set* minimum prices is circumscribed by § 608c(18), argues that he is not similarly restrained when making *adjustments* to minimum price pursuant to § 608c(5).

Plaintiffs argue that the plain meaning of § 608c(18) requires that, before the Secretary makes or amends rules affecting price, he must first undertake an analysis of market supply and demand. Plaintiffs contend that the Secretary should not promulgate rules or amendments affecting location adjustments unless he first finds that supply is inadequate to meet demand or that some disorderly market condition has resulted. The Secretary's final rulemaking specifically states that supply was *adequate* to meet demand prior to the rulemaking. 54 Fed. Reg. 26,778 (1989). Therefore, plaintiffs maintain that the prerequisites of § 608c(18) have not been met and that it was impermissible for the Secretary to amend Order 40.

The Secretary and the PEC assert that the 1989 amendments were promulgated pursuant to § 608c(5) which, they claim, gives the Secretary authority to make location adjustments but does not require the Secretary to undertake the economic analysis found in § 608c(18). The crux of the disagreement between the parties centers on the interpretation of the term "minimum prices." Section 608c(18) clearly requires that the Secretary take into account the economic factors described in that section before undertaking a rulemaking which fixes minimum prices. 7 U.S.C. § 608c(18). Defendants argue that minimum prices are the unadjusted Class I, Class II, Class III, and blend prices set for the region. While defendants acknowledge that the Secretary must consider § 608c(18) criteria when setting or modifying these class or blend prices, they argue that the regulation at issue did not change these prices but, instead, merely altered the adjustments that were made to the minimum price. Thus, the defendants claim that the Secretary did not need to consider the requirements of § 608c(18).

Plaintiffs, on the other hand, claim that the term "minimum prices" encompasses the adjusted prices in effect in each zone. According to plaintiffs, any change in the location adjustment changes the minimum price. Therefore, plaintiffs contend that the Secre-

tary must consider § 608c(18) factors before making location adjustments. Plaintiffs acknowledge that § 608c(5) gives the Secretary the authority to make location adjustments, but insist that § 608c(5) was meant to work in association with § 608c(18). Essentially, plaintiffs argue that § 608c(5) lists the types of rules that the Secretary has the authority to promulgate, but that § 608c(18) tells the Secretary when he can promulgate those rules.

Finally, the Secretary argues that it is plain from the language of § 608c(5)(A) that the location adjustment authority is not related to the setting of minimum price. Rather, it is related to the requirements that "[s]uch prices shall be uniform as to all handlers," expressly subjecting the "uniformity" requirement to the authority of the Secretary to "adjust" the price for the location at which milk is delivered. The Secretary also points out that § 608c(5) was originally enacted in 1935 and that § 608c(18) was not enacted until 1937. As a result, the Secretary asserts, the enactment of § 608c(18) was intended only to affect the Secretary's ability to set minimum prices, and not to affect the authority of the Secretary either to classify or to vary the uniformity of the prices and payments.

The district court rejected the Secretary's construction of the AMAA, holding that,

> [t]he term minimum price as used in section 608c(18) is nowhere explicitly defined in the statute nor is it defined by the Secretary in the regulations. Neither party could point the Court to any cases defining the phrase or specifically discussing its meaning in section 608c(18). At first blush, it might seem that the phrase "minimum price" as used in section 608c(18) is ambiguous and capable of two interpretations. Were the Court to find that such was the case, it would be required by the *Chevron* doctrine to defer to agency interpretation. After examining the phrase in the context of the rest of the statute, applying traditional canons of statutory interpretation, and viewing the legislative history and the Secretary's own use of the phrase, however, the Court concludes that the term is not ambiguous and that the plaintiffs' definition should prevail.

A statute should be viewed as a whole; therefore, this Court need not confine its interpretation to the one section it is now attempting to construe. *See* 2A *Sutherland Statutory Construction* § 46.05 (1992). It is thus appropriate for the Court to look at section 608c(5) when interpreting the phrase "minimum price." Section 608c(5)(A) states that the Secretary may fix a minimum price "for each such use classification which all handlers shall pay. . . ." 7 U.S.C. § 608c(5)(A). The statute goes on to state that:

> Such prices shall be *uniform* as to all handlers, *subject only to adjustments* for (1) volume, market, and production differential customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which such milk, or any such use classification thereof, is made to such handlers.

7 U.S.C. § 608c(5)(A) [emphasis added].

These passages indicate that the uniformity of the minimum price, not the minimum price itself, is subject to the location adjustments. Congress could have stated that minimum prices were subject to adjustments, implying that the minimum price was a base figure which, when altered by adjustments, became something other than a minimum price. Instead, the statute defines minimum price as a price which is initially uniform. The statute then allows departure from the *uniform* price in order to account for factors such as differences in location. Such a reading indicates that the term minimum price encompasses both the original uniform price and the adjusted price. Since the term minimum price includes adjusted prices, any regulation changing the adjustments in price must necessarily affect the minimum price.

*Farmers Union*, 1992 WL 71372, at *6 (footnote omitted).

## IV.

■ When a court reviews an agency's construction of a statute it is confronted with two questions. First and foremost is the question whether Congress has directly spoken to the matter at hand. *Chevron, U.S.A.,*

*Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781. If, however, the court decides that Congress has not directly addressed the precise question at issue, the court may not simply impose its own construction of the statute. *Id.* at 843, 104 S.Ct. at 2781–82. "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

Moreover, if a court finds the language of §§ 608c(5) and 608c(18) to be ambiguous, the Secretary's construction may not be disturbed if it reflects a reasonable construction of the statute and does not otherwise conflict with Congress' expressed intent. *Rust v. Sullivan*, 500 U.S. 173, 184, 111 S.Ct. 1759, 1767–68, 114 L.Ed.2d 233 (1991). More importantly, in determining whether the Secretary's construction is permissible, this Court "need not conclude that the agency construction was the only one it permissibly could have adopted ... or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. "Rather, substantial deference is accorded to the interpretation of the authorizing statute by the agency authorized with administering it." *Rust*, 500 U.S. at 184, 111 S.Ct. at 1767.

■ However, this deference does have its limits. Courts may invalidate agency adjudication or rulemaking which is "inconsistent with the statutory mandate or that frustrate[s] the policy that Congress sought to implement." *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981). Similarly, where the court determines that, given the intention of Congress to achieve some goal, " 'there are compelling reasons that [the agency interpretation] is wrong,' " the court may invalidate the agency's action. *Boettger v. Bowen*, 923 F.2d 1183, 1186 (6th Cir.1991) (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381,

89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969)). "[A] reviewing court should not defer to an agency position which is contrary to an intent of Congress expressed in unambiguous terms." *Estate of Cowart v. Nicklos Drilling Co.*, — U.S. —, —, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992); *accord Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.*, 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985).

■ The Court's first task is to determine whether the text of the AMAA addresses the precise issue at hand here—whether the Secretary is required to undertake a § 608c(18) economic analysis when exercising his § 608c(5) authority to make location adjustments to the minimum price of milk. The district court held that it does. Stating that it had utilized "traditional canons of statutory interpretation ... the legislative history and the Secretary's own use of the phrase [minimum price] ..." to determine that "the term is not ambiguous and that the plaintiffs' definition should prevail," *Farmers Union*, 1992 WL 71372, at *6, the district court rejected the Secretary's assertions that the plain language of § 608c(18) did not affect the Secretary's power to promulgate location adjustments pursuant to § 608c(5); that the language of § 608c(5) is not ambiguous; and that the plain language of §§ 608c(5) and 608c(18), read together, requires the Secretary to undertake the § 608c(18) analysis before making adjustments pursuant to § 608c(5).

Reading §§ 608c(5) and 608c(18) *in pari materia*, the district court concluded that the language of § 608c(5) permits the Secretary to make adjustments to the uniformity of the minimum price, but not to the minimum price itself. This distinction, the district court held, dictated the further conclusion that the term "minimum price" encompassed both the original uniform price and any adjustments to that uniform price.

The Secretary, on the other hand, believes that the term "minimum price" means only the original price which he must fix for the classification of milk. The Secretary contends that the adjustments which he is authorized to make pursuant to § 608c(5), such as the location adjustments, are adjustments

to uniformity, and that nothing in § 608c(18) requires that "minimum price" be read to include the original price as adjusted. In other words, the Secretary reasons that the "minimum price" is the original price that is the baseline from which he must calculate every adjustment which he is authorized by § 608c(5) to make.

The AMAA, and §§ 608c(5) and 608c(18) in particular, like much federal legislation, is not a model of clarity or succinctness. The interpretations of both the district court and the Secretary are reasonable and arguably can be supported by the language of the Act. However, we find that neither construction supports a finding that Congress has directly spoken on the "precise question at issue;" therefore, neither the plaintiffs' nor the Secretary's interpretation "give[s] effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781. The "[s]uch prices shall be uniform," language of § 608c(5) and the "prior to modifying the price fixed in any such term," language of § 608c(18), relied upon by the district court in its decision, are certainly susceptible to at least two different interpretations.

It is not our task to rewrite the language of the statute, nor to lecture Congress in how to write a statute which we could confidently declare is not ambiguous. It is, however, the duty of this Court faithfully to give effect to the unambiguously expressed intent of Congress; and, where there is no such unambiguously expressed intent, to determine if the agency whose duty it is to administer the statute has interpreted it in a reasonable and rational fashion. While we will not dwell on whether in recent years "unambiguously expressed intent of Congress" has become an oxymoron, we must declare that here we fail to see how the "plain language" of the contested provisions exclusively or even lopsidedly supports either the plaintiffs' or defendants' construction of the Act. If anything about this statute is plain, it is that if Congress had intentions with respect to the issue before us now, they certainly failed to make these intentions explicit in the text of the Act.

Because we cannot find the plain language of the statute to be unambiguous, we must defer to the Secretary's interpretation, unless we find that this interpretation "frustrate[s] the policy that Congress sought to implement." *Federal Election Comm.,* 454 U.S. at 32, 102 S.Ct. at 42. In order to determine what policy Congress sought to implement, we must resort to the Act's legislative history. First, we note that the district court relied on the Act's legislative history to the extent that it found:

> The legislative history of section 608c(18) indicates that it was enacted for "the guidance of the Secretary in fixing milk prices." S.Rep. No. 565, 75th Cong., 1st Sess. 3 (1937). It would be illogical for Congress to carefully articulate all factors the Secretary must take into account when fixing class prices yet allow location adjustments, which ultimately affect the actual cost of milk, to be adjusted without any guidance whatsoever.

*Farmers Union,* 1992 WL 71372, at *8.

We find, however, that this reading of the legislative history is too broad, and is improperly based on the district court's own interpretation of what the district court found it was "logical" for Congress to have intended. Section 608c(5) of the Act was added to the Agricultural Adjustment Act in 1935. Act of Aug. 24, 1935, Pub.L. No. 320 § 5, 49 Stat. 750, 753–57. Section 608c(18) was added two years later, when certain provisions of the Agricultural Adjustment Act were reenacted. Act of June 3, 1937, Pub.L. No. 137, § 2(f), 50 Stat. 246, 247. The House Report to § 608c(18), in relevant part, provides:

> Section 2(f) of the bill adds to section 8(c) of the Agricultural Adjustment Act two new subsections. The first deals with milk prices. Milk is the only commodity for which producer prices for interstate milk may be fixed by the Secretary of Agriculture through orders under the Agricultural Adjustment Act. The necessity for price regulation in the case of milk has also been recognized by many States which have established milk boards to fix producer prices for intrastate milk, and the validity of such State regulation has been upheld by the Supreme Court (*Nebbia v. New York* (1934), 291 U.S. 502 [54 S.Ct. 505, 78 L.Ed. 940]). Marketing agree-

ments and orders for milk ordinarily involve pooling and price plans which, to be effective, must continue with the up and down swings of economic factors which relate to price. The proposed amendment recognizes this, and provides that if the Secretary finds that the national parity price for milk does not adequately reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk in the marketing area to which the marketing agreement or order relates, he shall fix such prices as will reflect such factors, insure a sufficient quantity of pure wholesome milk, and be in the public interest. *The proposed amendment further provides that as the Secretary finds necessary on account of changed circumstances, he shall make adjustments in such prices. Such adjustments are to made in accordance with the same standards as are provided for the initial fixing of prices under this subsection.*

H.R.Rep. No. 468, 75th Cong., 1st Sess. (1937) (emphasis added).

Similarly, the Senate Report to § 608c(18) states, in relevant part:

Subsection (18) added to section 8(c) of the Agricultural Adjustment Act by section 2(f) of the bill provides a more workable standard for the guidance of the Secretary in fixing milk prices in an order issued for a particular marketing area. Milk is the only agricultural commodity for which prices are permitted to be fixed in orders issued under the Agricultural Adjustment Act and the Secretary is required to use the purchasing power of milk as his guide in the issuance of orders. This provision of the bill requires the Secretary, if an order or marketing agreement is to include fixed prices, to ascertain the prices which will be equivalent in purchasing power to prices of milk in the base period according to sections 2 and 8e of the Agricultural Adjustment Act. In addition, if he finds these ascertained prices are not reasonable in view of local price of feeds, the available supply of feeds and other economic conditions which affect the supply of and demand for milk in a particular marketing area, the Secretary shall fix such prices as will reflect these conditions, insure a suffi-

cient quantity of pure and wholesome milk, and be in the public interest. The peculiar nature of milk as a commodity and the power of requesting prices of this commodity have been set forth by the Supreme Court in its decision in the case of *Nebbia v. New York* (1934), 291 U.S. 502 [54 S.Ct. 505, 78 L.Ed. 940].

The reasoning there set forth can be applied with equal force to the regulation of interstate commerce in milk. The intricate problems of the milk industry as described in the above cited opinion, explain the use of the several pooling and price plans authorized for inclusion in milk orders. Their effectiveness depends upon their adaptability to conditions affecting each marketing area and upon their adjustment from time to time to meet changing conditions. *The Secretary is to use the same standard in adjusting prices as is to be used in the fixing of prices initially in the regulation of any marketing area.*

S.Rep. No. 565, 75th Cong., 1st Sess. (1937) (emphasis added).

While the legislative history does explicitly state that it is Congress' policy to provide "guidance [to] the Secretary in fixing milk prices," there is nothing in either report which expresses the unambiguous intent on the part of Congress for a construction of the Act other than that given it by the Secretary. Despite the district court's concerns that the Secretary can utilize his location adjustment authority to circumvent the economic factors of § 608c(18), there is nothing in the legislative history of the Act which indicates Congress was concerned about this possibility.

Having said this, we note that the last two sentences of both reports are troubling. One fair reading of that language supports the plaintiffs' contentions that when "adjusting prices" the Secretary is to use the "same standard" as that used in the fixing of prices initially; that is, the economic criteria of § 608c(18). However, this language is as fraught with ambiguity as the text of the Act itself. Nowhere in the legislative history is it specified whether "adjusting prices" refers to an adjustment to the minimum price pursuant to § 608c(5) or, whether this language refers to the Secretary's authority in

§ 608c(18) to adjust or modify the minimum price which he initially fixed. Neither is it clear to what "price" the House and Senate Reports are referring. Is this the "uniform" price, the "minimum" price, or the "adjusted" price? All of these concerns serve to delineate the fact that the legislative history of the AMAA does not make Congress' intent with respect to the issue before us any clearer.

Finally, the district court found, and the plaintiffs urge, that the Secretary's "new" interpretation of the AMAA is entitled to little or no deference because it reverses a longstanding agency policy that any location adjustment made under the authority of § 608c(5) must comport with the economic criteria of § 608c(18). The Secretary, on the other hand, contends that the interpretation argued in this Court has for over fifty years been the "contemporaneous and settled construction of the Act." The Supreme Court has long held that "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987) (quoting *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981)); *see also Batanic v. INS,* 12 F.3d 662, 666 (7th Cir.1993); *Exxon Corp. v. Lujan,* 970 F.2d 757, 762 (10th Cir.1992).

The district court, when faced with these arguments, concluded that the Secretary was not entitled to deference because he had not acted consistently. The district court determined that the Secretary's prior interpretations of §§ 608c(5) and 608c(18) explicitly recognized the fact that the Secretary's ability to promulgate location adjustments was restricted by § 608c(18). The district court found support for its holding in several different sources. In a publication put out by the United States Department of Agriculture (USDA) entitled *Questions and Answers on Federal Milk Marketing Orders* (AMS–559) (USDA pamphlet), the term "minimum price" was defined as "the least amount that proprietary handlers can pay producers for milk." This definition necessarily assumes that location adjustments are part of the minimum price as it would violate the mar-keting scheme for handlers in outlying zones to pay less than the adjusted price.

The district court next pointed out that the Secretary, through his Judicial Officer, has appeared to acknowledge overtly that he has a duty to comply with § 608c(18) when promulgating location adjustments. In the case *In re Borden,* 46 Agric.Dec. 1315, 1987 WL 119801 (Sept. 30, 1987), the Judicial Officer wrote that "§ 8c(18) of the Act (7 U.S.C. § 608c(18)) requires the Secretary to set milk prices, including location adjustments, at a level that will, by themselves, 'insure' a sufficient quantity of milk, now and in the future." *Id.* at 1459–60. A few pages later, the Judicial Officer continued, "the Secretary is required by § 8c(18) of the Act to make certain that the Class prices and location adjustments in every milk order are high enough to attract milk to every part of a marketing area." *Id.* at 1461. Thus, in the only authority directly on point, the Secretary's own Judicial Officer concluded that the Secretary's duties in setting location adjustments were governed by § 608c(18).

The Judicial Officer now disclaims any intent on his part to imply that the Secretary's ability to make location adjustments is restricted by § 608c(18). In his decision in the matter now before us, he held: "The entire [*Borden*] decision should be read for a full understanding of location adjustments.... I did not hold in *Borden* that location adjustments must be justified by a § 8c(18) analysis. I expressly held that the Secretary's location adjustment authority is under § 8c(5)." *In re Lansing Dairy,* 1991 WL 313838, at *60. Despite the Judicial Officer's avowals to the contrary, we believe that his opinion in *Borden* implies that the Secretary's location adjustments must comply with the requirements of § 608c(18).

In the Secretary's Proposed Rules, 54 Fed. Reg. 26,768 (1989), he gives further evidence that § 608c(18) has been relied upon in the past to justify location adjustment amendments. The Secretary cites to three letters sent to handlers denying their requests for location adjustments. In each of the three letters the stated reason for denying the amendment was "supply demand pricing standards contained in section 8c(18) of the Act." *Id.*

While no federal court has explicitly dealt with the issue of whether location adjustments must be promulgated pursuant to § 608c(18), at least one court has implicitly found that location adjustments are part of minimum prices and, as such, are governed by § 608c(18). In *Jones v. Bergland,* 456 F.Supp. 635 (E.D.Pa.1978), the Secretary issued a notice containing proposals for altering location adjustment differentials. The final order that was adopted, instead of merely making location adjustments, also changed the Class I price in the region. Plaintiffs in the case claimed that the order should not go into effect because the original notice was insufficient to make the Class I change because it "included a variety of proposals which effectively would have altered the *minimum price* of milk to … producers." *Id.* at 643 (emphasis added). As the district court in the matter before us noted: "In making this determination, the *Jones* court found that, at least for the purpose of notice, changes in location adjustments were one of several types of changes in minimum price that the Secretary might make." *Farmers Union,* 1992 WL 71372, at *8.

The plaintiffs in this appeal also direct our attention to *Schepps Dairy, Inc., v. Bergland,* 628 F.2d 11 (D.C.Cir.1979), which they assert buttresses their argument that the Secretary's position in this case is a sharp break with past practice. While we do not think that the *Schepps* case itself is particularly helpful to the plaintiffs' cause, the Secretary's brief from that case is interesting. In that brief, arguing against having to make a location adjustment in Houston, the Secretary states, "[t]he use of location differentials under Section 8c(5)(A) is permissive and *is governed* by the provisions in the Act which require that the Secretary set prices that insure an adequate supply of milk to the market and protect the public interest. 7

U.S.C. §§ 608c(4) and 608c(18)…." (emphasis added). In light of this evidence, indicating that the Secretary has given at least lip service to § 608c(18) when making § 608c(5) location adjustments in the past, we find not credible the Secretary's assertions that the interpretation of the Act he advances in this litigation is the same that he has adhered to for the last fifty years.

However, the fact that the Secretary is now advocating a position that is inconsistent with his past interpretation does not allow this Court simply to discount his current position. Quite the contrary, in *Rust v. Sullivan,* 500 U.S. 173, 186–87, 111 S.Ct. 1759, 1768–69, 114 L.Ed.2d 233 (1991), the Supreme Court held that an agency may change its interpretation of a statute so long as its position is reasonable and does not conflict with congressional intent. Specifically, the Court rejected the argument that "an agency's interpretation 'is not entitled to deference because it represents a sharp break with prior interpretations' of the statute in question." *Id.* at 186, 111 S.Ct. at 1769 (quoting *Chevron,* 467 U.S. at 862, 104 S.Ct. at 2791). The Court went on to hold "that a revised interpretation deserves deference because '[a]n initial agency interpretation is not instantly carved in stone' and 'the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis.'" *Id.* (quoting *Chevron,* 467 U.S. at 863–64, 104 S.Ct. at 2792); *see also Garrett v. Lyng,* 877 F.2d 472, 476 (6th Cir.1989) (so long as agency remains within the bounds established by Congress, it may reformulate its interpretations in light of political philosophy of the current administration). Therefore, the fact that the Secretary's interpretation may be different from that followed in the past is irrelevant so long as the current interpretation is reasonable and does not conflict with the unambiguously expressed intent of Congress.[3] Because, as discussed above, the lan-

---

3. Justice Scalia aptly summed up this principle in a lecture he gave at the Duke University School of Law.

The theory that judicial acquiescence in reasonable agency determinations of law rests upon real or presumed legislative intent to confer discretion has certain consequences which the courts do not yet seem to have grasped. For one thing, there is no longer any

justification for giving "special" deference to "long-standing and consistent" agency interpretations of law. That venerable principle made a lot of sense when we assumed that both court and agency were searching for the one, permanent, "correct" meaning of the statute; it makes no sense when we acknowledge that the agency is free to give the statute whichever of several possible meanings it thinks most conducive to accomplishment of

guage of the Act and the legislative history are not unambiguous and the Secretary's interpretation is neither unreasonable nor in conflict with Congress' intent, we are bound by *Chevron* to uphold the Secretary's interpretation.

## V.

The district court, having reached the conclusion that the contested amendments to Order 40 were unlawful for failure to address § 608c(18) economic factors, declined to address several other alleged defects in the rulemaking raised by the plaintiffs. Nonetheless, this Court may affirm the district court's judgment on any additional or alternative grounds for affirmance asserted by the party that prevailed in the district court. *See Dandridge v. Williams,* 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156–57 n. 6, 25 L.Ed.2d 491 (1970); *Katt v. Dykhouse,* 983 F.2d 690, 695 n. 3 (6th Cir.1992). Plaintiffs argue that even if a § 608c(18) analysis is not required when making location adjustments, the 1989 amendments are nonetheless invalid for a number of reasons. The plaintiffs argue first that the amendments are invalid because they are not supported by substantial record evidence; next, that the amendments are not based on an "economic service of benefit" to the handlers; third, that the amendments are invalid because the Secretary relied on the "prohibited factor" of handler use of milk in adjusting producer prices; and, finally, that the amendments destroy uniformity of price.

Because we find that the arguments concerning the use of a "prohibited factor," and the destruction of uniformity of price are clearly without merit, we reject them summarily. We will, however, address plaintiffs' contentions that the amendments are not rational or supported by the evidence and that they are not based on an economic service of benefit to the handlers.

■ Due to the fact that this is a consolidated case brought by plaintiffs challenging the Secretary's rulemaking pursuant to both the AMAA and the Administrative Procedure Act, 5 U.S.C. §§ 701–06, this Court's review is governed by two sets of standards. In *Defiance Milk Products, supra,* this Court held, "[o]ur review of the Secretary's decision is limited to whether the decision is in accordance with law and whether the decision is supported by substantial evidence. *See Lehigh Valley Farmers v. Block,* 829 F.2d 409, 412 (3rd Cir.1987); *Suntex Dairy v. Block,* 666 F.2d 158, 162 (5th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 59, 74 L.Ed.2d 62 (1982)." *Defiance Milk Prods.,* 857 F.2d at 1068. And section 706(2)(A) of the Administrative Procedure Act requires affirmance of the challenged regulation so long as it was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." In *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), the Supreme Court explained that "[u]nder the 'arbitrary and capricious' standard the scope of review is a narrow one. A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment....'" *Id.* at 285, 95 S.Ct. at 442 (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971)). Further, "[w]hile we may not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman,* 419 U.S. at 285–86, 95 S.Ct. at 442. We conclude that the Secretary's decision satisfies both of these standards.

the statutory purpose. Under the latter regime, there is no apparent justification for holding the agency to its first answer, or penalizing it for a change of mind.

Indeed, it seems to me that such an approach would deprive *Chevron* of one of its major advantages from the standpoint of governmental theory, which is to permit needed flexibility, and appropriate political partic-

ipation, in the administrative process. One of the major disadvantages of having the courts resolve ambiguities is that they resolve them for ever and ever; only statutory amendment can produce a change.
Antoin Scalia, *Judicial Deference to Administrative Interpretations of Law,* 1989 *Duke L.J.* 511, 517 (1989).

■ Substantial evidence in the record establishes that the Secretary's decision to reconfigure the location adjustments within the marketing area was rational. The Secretary heard several witnesses who testified as to the conditions of the milk market in Southern Michigan. *See* 54 Fed.Reg. 26,769–72 (1989). Evidence from the witnesses' testimony and other sources, established that since 1977, the last location adjustment inquiry made by the Secretary, a number of changes have occurred in the relevant marketing area that warranted a restructuring of the zones. The evidence shows that while the population in the marketing area as a whole was stable, sales of Class I product dropped over 10%, and production of milk increased more than 10%. *See* 54 Fed.Reg. 26,773 (1989). Further, evidence in the record indicates that Detroit, the ultimate consumption area under the Order, suffered a 12% population decline between 1976 and 1986, and that Class I sales in Detroit decreased by over 35%. *See* 54 Fed.Reg. 26,772 (1989). Finally, the evidence showed that two distributing plants had closed in the Detroit area. *Id.*

■ To meet the changed conditions, the Secretary chose to create three mainly self-sufficient zones with small location adjustments from zone to zone. *See* 54 Fed. Reg. 26,772–73 (1989). The manner in which the Secretary chose to remap the zones is largely a matter of his discretion; the Secretary's choice of a three-zone system will be upheld unless it was not a rational choice based on substantial evidence in the rulemaking. The Secretary specifically noted that under the new zoning arrangement "plants in the same general area will be treated alike and pricing equity among these competing handlers will continue." 54 Fed.Reg. 26,773 (1989). We find that the Secretary's decision was rationally related to and supported by the evidence.

■ The Secretary also determined that the mileage rates needed to be changed from 1 cent to 2.25 cents per hundredweight per ten miles. After hearing evidence from witnesses concerning this proposed amendment, 54 Fed.Reg. 26,775–77, the Secretary increased rates because he determined that the existing rate seriously overstated the value of milk at distant locations, and was inadequate to reflect hauling costs incurred under current conditions. 54 Fed.Reg. 26,777 (1989). It should also be noted that plaintiffs in this case agreed that the 1 cent per hundredweight mileage rate understated the cost of transportation. *Id.* The question of how much to increase the mileage rate is within the discretion of the Secretary so long as it is supported by substantial evidence, the proper economic factors, and is not arbitrary or capricious. After reviewing the record, we are satisfied that it contains substantial evidence to support the Secretary's decision to adjust the mileage rate location adjustment, that the appropriate factors were considered by the Secretary, and that the decision is neither arbitrary nor capricious.

■ Next, the plaintiffs contend that the Secretary's amendments do not comport with the law because they are not related to economic benefits obtained by milk handlers. A showing of economic service of benefit, "requires the Secretary to demonstrate, as a prerequisite to imposing the burden of price differentials on handlers, that the burden is imposed for the purpose of reflecting an economic service of benefit to the handler." *Fairmont Foods Co., v. Hardin,* 442 F.2d 762, 767 (D.C.Cir.1971). The economic service of benefit requirement is not mandated by the text of the Act itself; however, in *Zuber v. Allen,* 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969), the Supreme Court held:

The statute before us does not contain a mandate phrased in broad and permissive terms. Congress has spoken with particularity and provided specifically enumerated differentials, which negatives the conclusion that it was thinking only in terms of historical considerations. The prefatory discussion in the House Report emphasizes the congressional purpose to confine the boundaries of the Secretary's delegated authority. In these circumstances an administrator does not have "broad dispensing power." The congressional purpose is further illumined by the character of the other statutory differentials for "volume," "grade or quality," "location," and "production," *all of which compensate or reward the producer for providing an economic service of benefit to the handler.*

*Zuber*, 396 U.S. at 183, 90 S.Ct. at 323 (emphasis added) (footnotes and citations omitted).

In *Fairmont Foods, supra*, the D.C. Circuit, addressing the language of *Zuber*, held:

> On judicial review, it is the function of the court to assure that the Secretary has set forth findings and reasons which fully justify any differential from the uniform price,—and justify them on the limited grounds permitted by Congress, which allow increases in minimum prices to reflect economic service of benefit to handlers.... The court must invalidate orders resting on any basis other than such economic reasons,—whether the orders are ascribable to whim, which seems unlikely; or to response to the influence of major farm interests, which may be more likely; or merely bureaucratic error in supposing that the wisdom of experts as to what is needed in the public interest must be given dominance over the constraint of Congress.

*Fairmont Foods*, 442 F.2d at 766.

In *Schepps Dairy, Inc. v. Bergland*, 628 F.2d 11, 18 (D.C.Cir.1979), the District of Columbia Circuit reiterated the limits on the Secretary's authority: "the statutory listings of permissible adjustments to price uniformity among producers and handlers, respectively, are exhaustive, and the deviations authorized are solely 'for the purpose of reflecting an economic service of benefit to the handler.'" (quoting *Fairmont Foods*, 442 F.2d at 767). The Seventh Circuit adopted this position in *Borden, Inc. v. Butz*, 544 F.2d 312, 316 (7th Cir.1976), holding, "[t]he Secretary is authorized to make only certain adjustments and these are to 'compensate or reward the producer for providing an economic service of benefit to the handler.' *Zuber, supra*, 396 U.S. at 184, 90 S.Ct. at 323."

The Administrative Law Judge who ruled on the plaintiff handlers administrative petition, addressed this issue and concluded that the Secretary's amendments were illegal since they were not based on compensation to producers for providing an economic service of benefit to the handlers. The Judicial Officer rejected the ALJ's conclusion holding:

> The statute ... imposes no restriction on the purposes for which location adjustments are made, literally requiring only a showing of a difference "in location at which delivery of such milk is made." ... In particular, petitioners and the ALJ ... rely on dicta in *Zuber* in which the Court said that location adjustments "compensate or reward the producer for providing an economic service of benefit to the handler."

*In re Lansing Dairy*, 1991 WL 313838, at *61 (footnotes and citations omitted). The Judicial Officer, relying on his earlier decision in *In re Borden, Inc.*, 46 Agric.Dec. 1315 (1987), continued,

> *Borden* demonstrates that location adjustments can be adopted for any of the broad objectives of the Act, e.g., orderly marketing conditions; ensuring an adequate supply of fluid milk; uniformity as to producers or handlers; location value of milk; increased hauling costs; or a variety of circumstances.... *Borden* also examines the legislative history of the Act, which supports the Secretary's ability to fashion location adjustments for the greatest number of reasons. Therefore, petitioner's arguments, and the ALJ's conclusions, both of which characterize the Secretary's power to make location adjustments as being very limited, are not correct.

*In re Lansing Dairy*, 1991 WL 313838, at *62 (citations omitted). However, the Judicial Officer's attempt seemingly to back away from the "dicta" in *Zuber* and to expand greatly the Secretary's power to make location adjustments is contradicted not only by the decisions of several courts of appeals, but by his own decision in *Borden* as well, where he noted:

> In the absence of the legislative history, it could have been argued that a mere difference in location is sufficient reason to require one handler to pay higher prices than another governed by the same order. The legislative history shows that, in addition to meeting the literal language of the Act (by basing a difference in price on a difference in location), the difference in price must also be based on economic benefit to the handler paying a higher price....

*In re Borden*, 46 Agric.Dec. at 1393 n. 11.

The Judicial Officer cannot redefine the grant of the Secretary's authority. The Su-

preme Court has held and the Judicial Officer has acknowledged that the Secretary can make location adjustments for an exclusive, statutorily enumerated number of reasons; and, that those reasons must be supported by economic service of benefit to the handlers. Therefore, we reject the Judicial Officer's assertion that "location adjustments can be adopted for any of the broad objectives of the Act."

 Having previously found that the Secretary's findings in the rulemaking record and his decision to amend the location adjustments to Order 40 are supported by substantial evidence supporting his decision to amend the location adjustments to Order 40, it is now our task to determine whether the Secretary has justified them "on the limited grounds permitted by Congress, which allow increases in minimum prices to reflect economic service of benefit to handlers...." *Fairmont Foods*, 442 F.2d at 766. We conclude that the Secretary's decision, while not necessarily conforming to the letter of this requirement, is sufficiently in compliance with its spirit as not to require reversal.

The evidence in the record is not as clear as it might be on this point, but the Secretary appears to have taken the position, and the record supports a finding, that milk delivered to plants in the western and northern regions is now worth more than it was in 1977 because of increased consumption in those areas. The fact that the milk is now of greater worth is sufficient to provide the economic service of benefit required to satisfy the requirements of the Act. That producers for several years may have been delivering to handlers milk worth more than the producers were receiving for it does not prohibit the Secretary, even if belatedly, from recognizing this fact and restructuring location adjustment zones to compensate the producers for the economic service they are providing.

## VI.

Because we conclude that the Secretary's interpretation of the AMAA, that he need not undertake a § 608c(18) economic analysis before modifying location adjustments pursuant to 608c(5), is rational and not in opposition to the intent of Congress in enacting the AMAA, we REVERSE the district court's grant of summary judgment to the plaintiffs in this action. Since the district court's decision is reversed, there is no longer a need for the Secretary to conduct an additional rulemaking to repromulgate the location adjustments; therefore, the district court's order in this matter is VACATED.