**Clifford POFF, Geneva Cook, and Vince Rollins, Plaintiffs,**

**v.**

**CHATTANOOGA GROUP, INC.** d/b/a **Chattanooga Corporation and Chattanooga Corporation Employee Benefits Plan, Defendant.**

No. 1:93–CV–457.

United States District Court,
E.D. Tennessee.

Jan. 5, 1996.

**300**

George M. Derryberry, George M. Derryberry & Associates, Chattanooga, TN, Bruce A. Hankinson, Chattanooga, TN, for plaintiff.

Ronald George Ingham, Miller & Martin, Chattanooga, TN, for defendant.

### MEMORANDUM

COLLIER, District Judge.

Before the Court is the Motion for Summary Judgment filed by Defendant Chattanooga Group, Incorporated d/b/a Chattanooga Corporation and Chattanooga Corporation

Employee Benefits Plan ("Chattanooga Group" or "the company") (Court File No. 16).[1] Plaintiffs filed a Response (Court File No. 25). Plaintiffs allege Chattanooga Group violated Section 510 of the Employment Retirement Income Security Act of 1974 ("Section 510 of ERISA"), 29 U.S.C. § 1140 (1988), when the company fired them for the purpose of interfering with their rights to medical and health benefits provided by the company's self-insured benefits plan ("benefits plan"). For the following reasons, the Court will GRANT the motion for summary judgment.

### I. *RELEVANT FACTS*

Chattanooga Group designs and manufactures medical and therapeutic equipment. The company's overall sales began to decline in 1992 (Court File No. 17, App. 4, Aff. of Claude McCormick, ¶ 2). The company chose to streamline its operations by a reduction in force through lay-offs of unnecessary jobs and attrition (McCormick Aff. ¶¶ 2, 3). On 1 January 1992, Chattanooga Group employed 422 people; on 1 January 1993, 400 people; on 1 March 1993, 374 people; on 1 September 1993, 352 people; and on 1 November 1994, 316 people (Court File No. 17, App. 1, Aff. of Daniel A. Lawlor, ¶ 4).[2]

Plaintiffs contend Chattanooga Group fired them to keep them from further benefiting from the company's benefits plan. Plaintiffs uniformly argue Chattanooga Group "selected [them] for discharge ... because of their exercise of rights under the [benefits plan], ... because of their presentation and collection of substantial health claims" (Court File No. 25, p. 3). Plaintiffs add, "All three of the plaintiffs caused the defendant to incur substantial losses through payment of their self-insured health claims" (*Id.* at p. 9). At the time of each Plaintiff's discharge, the medical expenses totalled: for Clifford Poff ("Poff"), $71,798.02; for Geneva Cook ("Cook"), $32,-

---

1. This is a consolidated case. Cases numbers 1:93–CV–495 and 1:94–CV–152 were consolidated with case number 1:93–CV–457 pursuant to Court Order on 31 October 1994 (*See* Court File No. 14).

2. Plaintiffs do not sufficiently dispute that Chattanooga Group underwent a reduction in force.

By admitting Plaintiff Vince Rollins was "selected for layoff during the continuing course of defendant's reorganization. (Undisputed.)" (Court File No. 25, p. 6), Plaintiffs recognize Chattanooga Group did in fact face employment decisions regarding its employees, resulting in the discharge of many of those employees.

632.25; and for Vince Rollins ("Rollins"), a slightly disputed amount but at least $16,-164.00 (*See id.* at pp. 4–6; Court File No. 17, App. 1 at Ex. A).

To support its summary judgment motion, Chattanooga Group offers statistics demonstrating company employees with more costly health claims either remained on the job or were not otherwise discharged. The statistics cover the period from January 1991 until 30 September 1994. The statistics indicate: Nine benefits plan members had claims greater than Poff; of these nine employees, seven are still employed, one (1) is dead, and one (1) is on long term disability leave. Twenty-nine benefits plan members had claims greater than Cook; of these twenty-nine employees, one (1) is dead, one (1) is on long term disability leave, and only Poff was laid off. Eighty-six benefits plan members had claims greater than Rollins; of these eighty-six employees, two are dead, two are on long term disability leave, five were laid off (including Poff and Cook), and four more were otherwise terminated. Of one hundred twelve benefits plan members having claims exceeding $10,000.00, nine employees were laid off (including Plaintiffs) and four have been terminated. *See* Court File No. 17, p. 9, *citing* Lawlor Aff. ¶¶ 2, 3, 4, 13, 14, 15, and Ex. A.

Plaintiffs briefly and summarily contest these statistics. Plaintiffs argue the statistics, "without extensive further inquiry, [are] not conclusive or necessarily even probative of any relevant issue" (Court File No. 25, p. 9). They point to "discrepancies" (*Id.*).[3] Without support or further argument, Plaintiffs state "a one-dimensional analysis would ignore defendant's obvious incentive to get rid of employees known to have chronic or long-term health problems" (Court File No. 25, p. 9). The record does indicate the long

term health problems of both Poff (Crohn's disease) and Cook (Epstein–Barr virus, diagnosed after her termination), but does not show the discharge of other employees having long term health problems.[4] Plaintiffs do not offer evidence that contradicts the clear import of the statistics: Several employees with health claims higher, many substantially higher, than Plaintiffs were not discharged by Chattanooga Group.

## A. *Poff*

Poff became a full-time employee at Chattanooga Group in February 1990 after beginning work as a temporary literature clerk. He soon maintained a database of customers to facilitate company mailings and information distribution. As Marketing Communications Specialist, he also used the database in target marketing for seminar information regarding the sale of equipment. Poff helped coordinate the seminars and provide the seminar speakers with pertinent literature.

He also evaluated and selected an interactive software program to assist customers in their treatment of patients. Poff worked with another employee to install the program as part of a larger group of services the company already provided. During the work on this program in July 1992, Poff underwent surgery related to his Crohn's disease. He returned to work on a part-time basis forty-five days to two months after the surgery, then on a full time basis roughly two weeks later. Upon his return to work, Poff contends the company had removed the software project from him and given it to Chattanooga Group's in-house software development department. Taking the project from him, though, apparently did not reduce his workload.

---

**3.** The sole discrepancy Plaintiffs highlight concerns the difference of opinion as to the amount of health claims Rollins incurred (*See* Court File No. 25, p. 6). Plaintiffs' amount tallied less than that of Defendant, allegedly an indication of the company's inflated numbers. Chattanooga Group repeated that the amount figured for Rollins, and all other employees, was the total attributable to the employee, which thus included costs incurred by dependents (*See* Court File No. 17, p. 9; Court File No. 31, pp. 4–5).

**4.** The Court recognizes that a pattern of discharge of employees with long term health problems must begin somewhere. Although the statistics alone are not necessarily dispositive, Plaintiffs' failure to adequately address the weight of the statistics certainly does not bolster their argument of Chattanooga Group's "obvious incentive" to discharge these employees. *See infra.*

Poff argues Chattanooga Group in January 1992 reassigned to a newly hired employee, Paul Pirtle ("Pirtle"), a national database on which Poff had begun work. Poff explained to Pirtle the function, goals, and objectives of the database. He claims Chattanooga Group intended Pirtle to assume his duties and responsibilities and to replace him (*See* Court File No. 25, p. 4). Pirtle is a salaried employee who holds a Bachelor of Science degree in management and has extensive experience in sales. Unlike Poff, Pirtle travels as a salesman. Unlike Poff, Pirtle does not coordinate seminars. Chattanooga Group essentially argues Pirtle did work in *some* of the same areas as Poff did, but that Pirtle performed different and more extensive duties than Poff (*See* Court File No. 17, pp. 6–7 and No. 31, pp. 1–2).

Chattanooga Group laid off Poff on 25 February 1993 along with eighteen other employees, including Cook. Chris Linville, his department head, and Janice McAnally, one of his supervisors, made the decision to discharge him (Court File No. 17, p. 7). The company told Poff poor economic conditions, the absence of work, and the need to reduce the number of employees were the reasons for his termination (*Id., citing* Court File No. 1, Complaint ¶ 8 and Court File No. 17, App. 7, Poff Depo. p. 185).

Plaintiffs call these reasons pretextual. In support, Plaintiffs recount alleged statements made about Poff by the company's personnel director at the time, Ron Hamilton ("Hamilton"), which indicate Hamilton's concern over rising health care costs and his desire to see them reduced (Court File No. 25, p. 5). Plaintiffs do not contend Hamilton played a role in the decision to discharge Poff. In addition, Poff argues the company's offer to him of independent contracting work after his discharge was an attempt to circumvent the high cost of health claims (Court File No. 25, p. 4–5). Contrary to the company's contention, the company apparently did discuss with and consider Poff for possibly more than one project; however, Poff never actually performed any work for Chattanooga Group after his discharge. Poff and the company could not agree on a rate of pay.

*See* Court File No. 17, App. 7, Poff Depo. pp. 219–223; Court File No. 17, p. 17–18.

### B. *Cook*

Cook began working at Chattanooga Group in September 1979 as a switchboard receptionist. From late 1983 until 1993, she almost exclusively worked on the switchboard. In October 1992, the company responded to customer dissatisfaction over having a tape-recorded answering service and changed to a system of three switchboards. Cook and two employees who transferred from other jobs within the company operated the switchboards and shared responsibility for billing. Cook also had other small responsibilities, including spelling the receptionist for an hour or so per day. Before October 1992, Cook had also worked as the receptionist, but in October 1992 began working essentially full time as a switchboard operator.

Chattanooga Group laid off Cook on 25 February 1993 along with eighteen other employees, including Poff. The company did not lay off either of the other two switchboard operators, who, during assignment to the switchboards (and currently), also performed work they had done prior to their transfers. Chuck Thomas ("Thomas"), her supervisor, Art Johnson, her department head, and General Account Manager Mike Hutcherson made the decision to discharge Cook (Court File No. 17, p. 8). Cook does not know why the company discharged her. She suggests it was because of her medical and health claims, but does not offer direct evidence to support this "personal" opinion (*Id., citing* Court File No. 17, App. 6, Cook Depo. pp. 62–3, 65, 76, 78). Plaintiffs again allege then personnel director Hamilton made disparaging comments about rising health care costs and Cook's medical expenses (Court File No. 25, pp. 5–6). However, Plaintiffs do not contend Hamilton played a role in deciding to discharge Cook.

In July 1993, Cook learned she had Epstein–Barr virus. Prior to her diagnosis and during her employment, the company knew Cook received medical treatment (Court File No. 17, p. 8). Thomas, her supervisor, was not aware of any serious medical condition or

of any health care costs attributed to Cook (*Id.*). Upon her discharge, Cook elected to continue her group health coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. § 1161 *et seq.*, which amended ERISA to allow employees continued access to health insurance for a given period of time.

### C. *Rollins*

Rollins began work with Chattanooga Group in February 1989 as a mechanical assembler. During his last two and one-half years at the company, Rollins worked primarily on the "Balance Dynamic" machines in the engineering department.[5] The company trained another employee on the Balance Dynamic, but only Rollins regularly worked on it (Court File No. 17, p. 2, *citing* Court File No. 17, App. 8, Rollins Depo. pp. 68, 70). Orders for the Balance Dynamic dropped during 1993, though some of the machines needed repairs (Court File No. 17, p. 2) (noting only ten were assembled in 1993). In July 1993, the company temporarily assigned Rollins to the wire department. The company told Rollins orders for the Balance Dynamic were low, another employee could perform the labor required on the machines needing work, and the other department was busy (*Id., citing* Rollins Depo. pp. 66, 72–3).

Rollins contests his transfer to the wire department; he believes one (1) of two other employees should have been chosen. Chattanooga Group points out that the other two employees worked on the "Kin–Coms," another company product, were not trained on the Balance Dynamic, and were temporarily transferred out of the engineering department. Rollins had not worked on the Kin–Coms during the previous two and one-half years. He also testified he thought the other employee trained on the Balance Dynamic did any necessary work on them during his absence (Court File No. 17, p. 3, *citing* Rollins Depo. pp. 75–6). During the Spring of 1993, some employees from the engineering department received training on a new product. Rollins did not receive that training,

nor does he argue he should have (*Id., citing* Rollins Depo. pp. 77–8).

Chattanooga Group did not reassign Rollins to his old department. On 9 September 1993, the company discharged him, stating work was slow (*Id., citing* Rollins Depo. pp. 54–5, 66). Vice President of Manufacturing Dan Lawlor and Personnel Director Hamilton made the decision to lay off Rollins because of a decline in work. In addition, his supervisor in the wire department found his performance unsatisfactory (*Id., citing* Lawlor Aff. ¶ 8). Rollins argues the engineering supervisor intended to have Rollins work on a new product and the company had to pay overtime to meet work demand (Court File No. 25, p. 7). Chattanooga Group responds that work demand declined and any overtime went toward work on a product Rollins was "not familiar with" (Court File No. 31, p. 2, *citing* Rollins Depo. pp. 69–70).

Rollins contends the company hired another mechanical assembler to replace him (Court File No. 25, pp. 7–8). Chattanooga Group initially asserted it did not hire anyone or transfer anyone into the wire department as Rollins' replacement, and current employees absorbed any necessary work on the Balance Dynamic (*Id.*). In its Reply, Chattanooga Group directly addressed Rollins' contention. The company stated it *did* hire another mechanical assembler *but only after* the resignation of another mechanical assembler (Court File No. 31, p. 2). The actual number of mechanical assemblers actually thus declined by one (1).

As do the other Plaintiffs, Rollins contends Chattanooga Group fired him because he exercised his rights under the benefits plan. He last made a claim in February 1992 (*Id.* at p. 4, *citing* Lawlor Aff. ¶ 16). Rollins did mention to Hamilton in January or February 1993 he was considering having an ankle operation, but he did not give a specific date for the operation. He again mentioned the operation to Hamilton at the time of his layoff in September 1993, though again he

---

5. Chattanooga Group asserts Rollins was never employed in the engineering department and cites Rollins' deposition testimony as support (*See* Court File No. 31, p. 2 and attached pp. 66–

7). The Court reviewed the cited deposition pages and found reference only to a "Department 64." It is thus unclear in *what type of* department Rollins worked.

did not give a specific date for it. Rollins argues "the proximity in time of [his] discharge with his notification of the need for additional surgery" strongly suggests the company's intent to rid itself of costly employees (Court File No. 25, p. 11). He testified Hamilton at the time of his layoff suggested to Rollins that he should continue his health insurance coverage under COBRA. Rollins did not elect to continue his coverage (*See* Court File No. 17, *citing* Rollins Depo. pp. 114–15). Chattanooga Group argues COBRA would have covered Rollins' ankle operation, an argument Plaintiffs do not address (*See id.* at p. 4).

### D. Hamilton's Role

That Hamilton made remarks, in general, regarding the cost of health claims is not disputed (*See* Court File No. 31, p. 2). Chattanooga Group argues Hamilton's job as administrator of the benefits plan necessarily required him to review and keep track of these costs. Plaintiffs argue he was "obsessed with reducing employees' health care claims" (Court File No. 25, p. 8). To support this contention, in addition to the alleged specific remarks he made, Plaintiffs provide two memoranda circulated by Hamilton, which allegedly demonstrate his unhealthy "preoccupation with health care plan costs" (*Id.; see* Court File No. 26, Exs. E and H). The Court's review of these two documents leads to a contrary understanding. The first one educates employees how to "save [themselves] money," by avoiding "non-emergency treatment," as defined by the benefits plan, in an emergency room (Court File No. 26, Ex. E). The second one educates employees how to "be assured of receiving maximum benefits for eligible services" when needing lab work performed, by using independent medical laboratories approved as preferred providers (Court File No. 26, Ex. H).

Significantly, Plaintiffs do not contend Hamilton helped make the decision to terminate either Poff or Cook. He did apparently play a role in the decision to discharge Rollins, though he was not the sole decisionmak-

er.[6] In light of Hamilton's alleged obsession with health care claims, Plaintiffs make much of Rollins' conversations with Hamilton concerning his possible ankle operation and the proximity of the last conversation to his lay off. As noted above, Rollins testified Hamilton suggested he continue his coverage under COBRA, but he did not. Chattanooga Group argues COBRA would have extended the benefits plan's coverage and included the ankle operation (Court File No. 17, p. 4). Plaintiffs do not address this argument.

### II. STANDARD OF REVIEW

██ Under *Fed.R.Civ.P.* 56(c), the Court will render summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show that no genuine issue of material fact exists, *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir.1994); *Kentucky Div., Horsemen's Benev. & Prot. Assoc., Inc. v. Turfway Park Racing Assoc., Inc.*, 20 F.3d 1406, 1411 (6th Cir.1994), and the Court must view the facts and all inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Oakland Gin Co., Inc. v. Marlow*, 44 F.3d 426, 429 (6th Cir. 1995); *City Management Corp. v. U.S. Chemical Co., Inc.*, 43 F.3d 244, 250 (6th Cir.1994). Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Lansing Dairy*, 39 F.3d at 1347; *Horsemen's Benev.*, 20 F.3d at 1411. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of

---

**6.** The record before the Court indicates Dan Lawlor ("Lawlor"), Vice President for Human Resources, initiated the decision to lay off Rollins and then consulted with Hamilton (Court File No. 17, App. 1, Lawlor Aff. ¶ 8). Lawlor cited Rollins' poor performance in the wire department and the wire department's decrease in work (*Id.*).

proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553.

■■■ The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435–36 (6th Cir. 1987). The standard for summary judgment mirrors the standard for directed verdict. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.; Lansing Dairy*, 39 F.3d at 1347; *Horsemen's Benev.*, 20 F.3d at 1411.

## III. ANALYSIS

### A. Burden-shifting and a prima facie case

■■■ Section 510 of ERISA makes it unlawful to discharge or otherwise discriminate against an employee for the purpose of interfering with protected rights. The statute provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

29 U.S.C. § 1140 (Section 510 of ERISA). To analyze claims brought under Section 510, courts use the *Burdine* burden-shifting paradigm familiar to Title VII cases. *See Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043

(6th Cir.1992); *see generally Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

■■■ Thus, a plaintiff must first show the existence of a *prima facie* case. A *prima facie* case consists of "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Humphreys*, 966 F.2d at 1043 (citation omitted). To demonstrate a violation of Section 510, a plaintiff "must show that an employer had a specific intent to violate ERISA." *Id., quoting Rush v. United Technologies, Otis Elevator Div.*, 930 F.2d 453, 457 (6th Cir. 1991). The plaintiff need not show the employer's sole purpose for the discharge was interference with the plaintiff's benefits, but rather that it was "a motivating factor" in the decision. *Humphreys*, 966 F.2d at 1043 (citation omitted).

■■■ Upon the plaintiff's showing of a *prima facie* case, the employer must then "introduce admissible evidence of a legitimate, nondiscriminatory reason for its challenged action." *Id.* (citations omitted). Should the defendant meet its burden, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered legitimate reasons were actually a pretext for discrimination. *St. Mary's*, 509 U.S. at ––––––, 113 S.Ct. at 2747–48 (race discrimination). To show pretext, the plaintiff "must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir.1994) (age discrimination). To do so, the plaintiff is

> required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [the] discharge, or (3) that they were *insufficient* to motivate discharge.

*Id.* at 1084 (citation omitted); *Humphreys*, 966 F.2d at 1043 (noting the plaintiff must show the interference was "a motivating factor" or the "proffered reason is unworthy of

credence"). The ultimate burden of proving a case of employment discrimination rests at all times with the plaintiff. *St. Mary's*, 509 U.S. at ——–——, 113 S.Ct. at 2747–48.

### B. *Specific intent*

■ As noted above, the plaintiff must demonstrate the employer acted with specific intent to violate ERISA. *See Humphreys*, 966 F.2d at 1043; *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 37 (1st Cir.1995) (noting "the ultimate inquiry ... is whether the employment action was taken with the specific intent of interfering with the employee's ERISA benefits") (citations omitted). If a plaintiff fails to show an employer's specific intent to violate Section 510 of ERISA, the plaintiff fails to demonstrate a *prima facie* case, and a court may grant summary judgment. *Wyatt v. United States Fidelity & Guaranty Co.*, 59 F.3d 172 (table), 1995 WL 376719, at p. *2 (6th Cir. June 22, 1995); *Barbour*, 63 F.3d at 39 (noting "the plaintiff must *always* adduce evidence sufficient for a rationale jury to conclude that the employer's action was motivated by an intent to interfere with ERISA benefits").

■ Consideration should of course be given to the plaintiff's use, or anticipated use, of a plan's benefits. *See Humphreys*, 966 F.2d at 1044 (noting that the "proximity to vesting [of pension benefits] provides at least some inference of intentional, prohibited activity"). Yet, upon the employer's showing of legitimate reasons for the termination, an employer's "cost savings and proximity to benefits" will not always entitle a plaintiff to a trial. *See id., citing Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1117 n. 1 (2d Cir.1988) (noting that courts cannot consider "mere cost savings and proximity to benefits [as] sufficient *per se* to create a genuine issue of material fact"); *see also Johnson v. Square D Co.*, 977 F.2d 581 (table), 1992 WL 296854, at *2 (6th Cir. Oct. 15, 1992) (noting that the "mere fact" an employee's "termination would save [the employer] money in pension costs, standing alone, is not sufficient to prove the requisite intent") (citation omitted). Thus, where the loss of benefits was a consequence of or incidental to the employee's discharge, there is an absence of specific intent. *See Barbour*, 63 F.3d at 37; *Hopkins*

*v. Seagate*, 30 F.3d 104, 106 (10th Cir.1994); *Hart v. Reynolds & Reynolds Co.*, 999 F.2d 540 (table), 1993 WL 243797, at p. *4 (6th Cir. July 6, 1993).

■ The Court finds Plaintiffs failed to demonstrate Chattanooga Group specifically intended to violate Section 510 of ERISA. Plaintiffs thus fail to state a *prima facie* case. *Wyatt* provides guidance. In *Wyatt*, the employer suffered financial difficulties, downsized it operations, reduced its staff, implemented cost-cutting measures, and considered employees' job performance as a factor in determining which employees to dismiss. *See Wyatt*, 1995 WL 376719, at p. *1; *see also Johnson*, 1992 WL 296854, at p. *1 (noting the employer underwent a plantwide reduction in force, remaining employees assumed the plaintiff's duties, and the plaintiff was one of twenty-seven employees discharged); *Sherman v. Chase Packaging Corp.*, 933 F.2d 1009 (table), 1991 WL 85246, at p. *3 (6th Cir. May 21, 1991) (noting the employer sold a facility and had a corresponding reduction in force); *Kelly v. Georgia–Pacific Corp.*, 835 F.2d 878 (table), 1987 WL 24142, at p. *2 (6th Cir. Dec. 8, 1987) (noting the employer "hired no one to replace" an employee working in an area "no longer profitable").

The facts of the case before the Court resemble those of the above-cited cases. Chattanooga Group underwent a reduction in force. The record clearly indicates a steady reduction in the number of company employees from 1 January 1992 until 1 November 1994, about a month before the filing of the summary judgment motion. Plaintiffs did not sufficiently contest this fact. Nor did Plaintiffs sufficiently demonstrate the company hired replacement employees. In fact, Plaintiffs did not sufficiently dispute the company's position that remaining employees absorbed any work Plaintiffs had performed. Significantly, Plaintiffs did not adequately defend against the statistics proffered by Chattanooga Group, which showed many employees having substantially higher medical and health claims remained on the job.

Plaintiffs did show Hamilton allegedly made critical comments about Plaintiffs'

medical and health claims. However, with the possible exception of Rollins, Hamilton apparently played little role in the decision to discharge Plaintiffs. Even if Hamilton had made the comments attributed to him, the Court finds that would not raise a genuine issue of material fact. *See Wells v. New Cherokee Corp.*, 58 F.3d 233, 238 (6th Cir. 1995) (noting that individuals making comments must be "meaningfully involved in the decision to terminate an employee"). Plaintiffs did not show a link between those alleged comments and the decision to discharge Rollins, or Poff and Cook, because Plaintiffs did not sufficiently contest the ultimate issue in this case: Economic reasons compelled Chattanooga Group to undergo a reduction in force, discharge some of its employees, and, after having done so, have remaining in its work force many employees with substantially higher medical and health claims than Plaintiffs. It is not the Court's role "to review [a company's] ... business decisions or question the soundness of an employer's judgment." *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990); *see also Walker v. AT & T Technologies*, 995 F.2d 846, 849-50 (8th Cir.1993) (noting an "employer has the right to make business decisions—to assign work, to change an employee's duties, to refuse to assign a particular job, and to discharge—for good reason, bad reason, or no reason at all, absent intentional ... discrimination").[7]

Such is the case here. Chattanooga Group underwent a reduction in force, and Plaintiffs did not sufficiently demonstrate the decisions to discharge them were specifically intended to violate ERISA. Plaintiffs have offered little more than "[m]ere personal beliefs, conjecture, and speculation," an insufficient basis for supporting a claim brought under Section 510 of ERISA. *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) (age discrimination), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987). Accordingly, the Court will **GRANT**

---

7. The Court concludes, *arguendo*, that even if Plaintiffs had shown a *prima facie* case, Plaintiffs did not meet their burden of proving pretext. *See Manzer*, 29 F.3d at 1084; *Humphreys*, 966

the motion for summary judgment filed by Chattanooga Group (Court File No. 16).

F.2d at 1043. Chattanooga Group proffered legitimate, non-discriminatory business reasons for its decisions to discharge Plaintiffs and support for those reasons.